## LORD MFG. CO. v. UNITED STATES.
### Nos. 46573, 47328.

United States Court of Claims.
July 11, 1949.

Clarence B. Des Jardins, Cincinnati, Ohio, for the plaintiff. Ralph Hammer, Seattle, Wash., was on the briefs.

S. R. Gamer, Washington, D. C., with whom was H. G. Morison, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and HOWELL, MADDEN, WHITAKER and LITTLETON, Judges.

JONES, Chief Judge.

These cases involve the amount to be paid plaintiff for rubber and metal mountings furnished defendant during a part of the war period and used to prevent shock and vibration and to prolong the life of mechanical equipment.

About 1919 H. C. Lord began experimenting in vibration absorption and through the succeeding years, as a pioneer in that field, secured patents covering various products. Between 1920 and 1935 he manufactured and sold the products which he had developed. Little or no profits were made

prior to 1934. In fact, it is claimed that many thousands of dollars were sunk or lost in the venture during those years. It is certain that considerable sums were used to develop the business by H. C. Lord and an employee, Miss Hartman, who later became Mrs. Lord.

The early devices were developed and produced for industry generally, especially engines, heavy equipment, trucks and busses. But with the growth of the airplane industry in which prevention of vibration is vitally important, plaintiff turned his primary attention to that industry. The protection of the craft, the sensitive flight instruments, and other equipment from vibration, was of extreme importance. Until the early 1930's all-weather flying was virtually impossible due to inaccuracy of flight instruments caused by vibration.

Prior to 1932 other persons began working on the vibration problems, but the devices which they developed were more expensive and less satisfactory than those produced by plaintiff.

About 1932 Lord perfected what is known as the plate form of mounting which was an important advance. About 1938 the Navy discarded the Lancaster mountings which it had been using, and they were replaced by the Lord mountings. The principle of "rubber in shear" which plaintiff had developed was accepted by the industry generally by 1939. Also the plaintiff developed the "tube form," the "sandwich" and "dynafocal" mountings as larger engines were coming into use. All of these were improvements. The "dynafocal" mountings have become the most important of plaintiff's products since 1939.

During the 1930's the War Department was also working on the vibration problems of aircraft and established a laboratory at Wright Field where extensive experimenting was done. An aeronautical engineer, W. E. Stitz, developed an improvement on the Lord mountings and secured a patent therefor. It was never produced in commercial quantities and the patent was assigned to Lord, subject to a license retained by the United States for government purposes.

In the meantime Lord had secured several additional patents. In 1940 the company was incorporated with H. C. Lord, Mrs. Lord and a son, Thomas Lord, as principal stockholders.

Through pioneering work and its success in developing products the company dominated the field with no real competition until about 1942.

In 1936, with the general acceptance of its mountings by the airplane industry and the growth of that industry, the plaintiff, for the first time, began to show substantial profits and these rapidly increased through the succeeding years. On April 1, 1940, the company had only 170 employees. At the end of 1942 it had 1,850 employees. Its profits, before taxes and renegotiation, increased from $36,000 in 1936 to more than $9,000,000 in the first 10 months of 1944. To a large extent the profits were allowed to remain in the business and were used for plant expansion, purchase of materials and increasing operations. The net worth of the business increased from $133,000 in 1936 to more than $4,000,000 in 1944.

During the years 1942 to 1944 a number of competitors entered the field, but the plaintiff remained the only company manufacturing a full line and the sole source of supply for many of the items. Plaintiff maintained its prices notwithstanding the volume. Competitors at first charged somewhat similar prices, but with the increasing volume materially reduced their prices. However, because of its dominance in the field plaintiff was able to maintain its prices and to furnish about 60 percent of all the items the services used in its field.

In 1942 the procurement authorities at Wright Field, where immense contracts were let, adopted the policy of requiring all contractors who proposed to enter into substantial fixed-price contracts to submit a cost break-down showing labor, material, overhead and other costs and the amount of the proposed profit.

A cost analysis branch was established. Conferences were arranged and agreements sought, and while no rigid rule was established, the system was designed to prevent excessive profits and to make certain that

contractors would receive profits commensurate with the risks assumed and services performed. A profit generally from six to ten percent was allowed, dependent on the nature of the business, and where risks were greater as much as 12 percent was allowed. Contractors were also subject to renegotiation during most of the war period.

The procurement system was almost unanimously accepted by the contractors who dealt with the Government at Wright Field, where more than 75 billions were let in war contracts.

The Navy Department had a similar procurement system.

In late November 1942 in connection with plaintiff's quotations on several different items defendant requested a cost break-down, but the break-down was not furnished. Instead, plaintiff referred the Army Air Force to an audit made in June 1944 of items purchased during 1941. That audit indicated profits of $2,800,000 on approximately $5,000,000 total business done during the period covered by the audit. Plaintiff's officials were requested to come to Wright Field to discuss its prices with officials of the Procurement Division. At the conference plaintiff's president took the position that plaintiff's products were patented, and that plaintiff could for that reason charge any price that the market would bear; that commercial producers had paid plaintiff's prices over a long period of time, thus establishing its prices, and that it was charging the defendant only such established commercial prices.

After consideration the officials of the cost analysis branch recommended to those in charge of procurement that the contract be not placed with plaintiff because its prices were excessive. However, as plaintiff was the sole source of many of the items and spare parts urgently needed to maintain plaintiff's mounts which had already been installed in airplanes in operation, the officials purchased the products from plaintiff at its prices. Thereafter at various times through 1943 similar procurements, although disapproved by the cost analysis branch, were nevertheless made from plaintiff by the Army Air Force procurement officials.

During the fall of 1943 the procurement activities of Wright Field were decentralized to various districts. In January 1944 the Eastern Procurement District found it necessary to purchase $650,000 worth of mounts and spare parts on which plaintiff submitted a quotation but without the requested cost break-down. Another conference followed and the whole matter was referred to headquarters at Wright Field.

While the matter was thus pending the Under Secretary of War on January 31, 1944, acting under the Renegotiation Act,[1] found and determined that $5,200,000 of the profits realized by plaintiff during its fiscal year ending December 31, 1942, were excessive. Plaintiff was directed to repay such excessive profits. This matter is now pending in the Tax Court of the United States upon plaintiff's request for redetermination.

In March 1944 another conference was held at Wright Field in an effort to get some agreement for reduced prices to avoid the procedure involved in obtaining the products by an order issued under Section 9 of the Selective Training and Service Act.[2] The Procurement Division offered to accept plaintiff's estimate of the cost as set forth in its submitted cost break-down, plus a profit of 15 percent. Telegrams were exchanged in reference to this matter without any definite conclusion being immediately reached.

At about this same time the Navy was seeking to purchase some needed items but as plaintiff's prices were substantially above those of its competitors, the Navy sought an adjustment in prices since it preferred plaintiff's products. Not succeeding, the Navy determined to procure the needed items by means of an order issued under Section 9 of the Selective Training and Service Act of 1940, supra. Accordingly,

---

[1] Sec. 403 of the Sixth Supplemental National Defense Appropriation Act, 1942, 56 Stat. 226, as amended, 50 U.S. C.A.Appendix, § 1191.

[2] 54 Stat. 892, as amended 57 Stat. 164, 50 U.S.C.A.Appendix, § 309.

under date of April 27, 1944, the Acting Secretary of the Navy placed an order with plaintiff designated as Compulsory Order No. 2, which is set out in full in finding 19. By the terms of this order the plaintiff was directed to deliver the items specified. Compliance was made obligatory, and plaintiff was advised that it would be paid fair and just compensation for the items delivered.

Plaintiff protested this order and resubmitted its regular price list. The Acting Secretary of the Navy replied insisting upon the order because he regarded the profits which plaintiff's cost estimate showed it to be making as excessive.

On May 19, 1944, the Under Secretary of War transmitted to plaintiff an order dated May 6, 1944, designated as a compulsory order, for the furnishing and delivery by plaintiff to the War Department of specified quantites of 61 items which were being manufactured by the plaintiff. These items included the products of the plaintiff which were the subject of the conference at Wright Field. This order is set out in full in finding 22. It was similar in terms to the Navy order heretofore referred to.

In the letter of transmittal, however, it was indicated that at any time the plaintiff wished to come to a voluntary agreement it could submit its proposal to the Procurement Division.

In the meantime, in order to make a determination of the prices of the items covered by its compulsory order the Navy Department made an examination of plaintiff's books and records to determine the cost of manufacture. The Navy's representatives were assisted by plaintiff's cost accountant. Since plaintiff's books were not up to date the computations were based principally upon plaintiff's 1943 cost of manufacture as supplemented by any available 1944 cost data. The report showed that by allowing every cost item appearing on plaintiff's books, including administrative overhead and selling and patent expenses, plaintiff at its quoted prices would make a profit ranging from 59 to 147 percent on the various items. Upon the basis of this report the Navy Department determined that a price which would return plaintiff a profit of ten percent would be fair and reasonable. The Secretary of the Navy sent plaintiff a copy of an order entitled "Price Determination Under Compulsory Order No. 2," setting out these prices and declaring that he had determined that such prices were reasonable and constituted fair and just compensation.

On May 29, 1944, the War Department, under its compulsory order, requested a cost breakdown on the 61 items which it required. Its analysis indicated that if the prices which plaintiff had quoted to its Procurement Division were paid plaintiff would make a profit of 43.84 percent on its cost.

On June 13, 1944, a meeting was held in Washington, D. C., between seven of plaintiff's representatives and over 20 representatives of the War and Navy Departments to ascertain whether a voluntary agreement could be reached with plaintiff concerning prices for the items covered by the Army and Navy compulsory orders that had been issued. Defendant's representatives renewed the offer of 15 percent profit but the offer was rejected.

On June 29, 1944, plaintiff entered into two contracts with the Navy Department for the furnishing of certain of plaintiff's products, each of which contained a price redetermination clause by the terms of which if defendant objected to the prices quoted by the contractor an effort should be made to agree upon prices, failing which the list price should govern unless fixed by the Secretary of the Navy under Title VIII of the Revenue Act of 1943,[3] and providing further that if any price or prices so fixed should be reviewed by a court of competent jurisdiction the price or prices for any quantity of such articles delivered prior to the effective date of such order should be adjusted to coincide with the price or prices so revised by the court, and any necessary refunds made.

On July 13, 1944, another meeting was held in Washington between six representatives of plaintiff and three representatives from the Army and three from the Navy.

---

[3] 58 Stat. 21, 92, §§ 801, 802, 50 U.S. C.A.Appendix, § 1192.

Defendant's representatives pointed out that plaintiff's inventory exceeded the requirements of its orders on hand by approximately $1,000,000, and that if it were true that plaintiff's need for operating capital required the charging of high prices, its financial situation could be improved by a reduction in its inventory. Plaintiff's representatives asked defendant's representatives to assist plaintiff in obtaining certificates of necessity. The following day Commander McGuire, as assistant head of the price revision division, conferred with plaintiff's attorney who stated that to reprice plaintiff's products it would be necessary to determine their costs and that this would take several months. Commander McGuire stated that the services could not wait that long, and proposed an immediate price discount arrangement until individual prices could be realistically established, and if necessary, made retroactive.

On July 20, 1944, another meeting was held in Washington, D. C., between plaintiff's representatives and those of the War and Navy Departments to discuss a formula for the interim over-all price reduction arrangement which had been previously suggested by Commander McGuire. Defendant's representatives suggested that plaintiff reduce its prices by 32 percent and that within 60 days plaintiff submit cost break-downs on its products, and that the interim prices would remain in effect only until plaintiff's cost could be accurately determined, at which time the prices would be again reviewed and adjusted. Plaintiff's representatives were agreeable to defendant's proposal and agreed to submit it to plaintiff for a decision. This offer was conditionally accepted. Shortly thereafter, however, the plaintiff conditioned its acceptance not only on the approval of outstanding applications for certificates of necessity, but also on freedom from renegotiation.

On August 29, 1944, another conference was held at which defendant's representatives again offered to pay prices in accordance with the 32 percent discount formula. Plaintiff's representatives again stated that they would enter into no agreement with respect to prices until they had obtained the approval of certain outstanding applications for certificates of necessity, and unless plaintiff was to be exempted from renegotiation. Since the responsibility for these questions rested with other branches of the Government, no agreement was reached at these meetings concerning plaintiff's prices. Plaintiff's representatives had stated at the meeting that it had been granted certificates in the amount of approximately $1,800,000. Investigation revealed, however, that plaintiff had already been granted certificates of necessity relating to its plant expansion in the amount of approximately $3,700,000.

After the meeting Thomas Lord and Col. McGrath again conferred and Mr. Lord agreed that the Services' proposal with respect to the 32 percent discount formula was fair and that he would recommend its acceptance. On the following day, however, he reported to Col. McGrath that he had not been able to obtain the approval of plaintiff's other officials. Defendant's officials then concluded that they had no alternative except to commence formal proceedings under Title VIII of the Revenue Act of 1943, supra, for the repricing of plaintiff's products.

The War Department on August 30, 1944, delivered to plaintiff a letter headed "Requirement to Negotiate Fair and Reasonable Prices." The letter, which is set out in finding 36, required negotiation in reference to the items named, called for certain information, and stipulated that refusal to negotiate would be construed as a refusal to agree to fair and reasonable prices. An identical letter was sent on the same date to plaintiff by the Navy Department.

The War and Navy Departments, commencing September 1, 1944, conducted a joint examination of plaintiff's books and records to determine plaintiff's current unit costs of manufacturing 655 items it was furnishing to the Departments, either directly under prime contracts or indirectly under subcontracts or purchase orders. These items included practically all of plaintiff's products then being manufac-

tured and on order. A thorough examination was made and on the basis of the examination it was disclosed that if plaintiff were permitted to apply its prices on the approximately $16,000,000 of unfilled orders it had on its books as of June 30, 1944, it would, if the cost of manufacturing those items remained the same as for the period investigated, make a profit of 73.36 percent on its cost, and that plaintiff had realized profits of 73.05 percent based on its total 1943 business, and 86.65 percent on its January and February 1944 business. The representatives of the Services also calculated what the selling price of the 655 items investigated would be if the profits were limited to 10 percent of the estimated cost of such items.

Another conference was held in plaintiff's offices in Erie, Pennsylvania, on September 18, 1944, between representatives of the plaintiff and the Army and the Navy. Discussions ran along the lines of previous conferences. As to certificates of necessity the representatives of the Services said they had done everything they could to assist plaintiff. As to any stringent cash situation which plaintiff might be encountering, defendant's representatives offered to make advances against contracts, but plaintiff's representatives rejected this proposal, saying they wanted either a bank or a Reconstruction Finance Corporation loan. The audit was then discussed and plaintiff's representative who was spokesman at the meeting stated he was willing to accept as accurate the audit which had been made. Because of the same objections and complaints heretofore indicated the conference failed to reach an agreement.

On September 23, 1944, the Secretaries of War and the Navy jointly isssued an order fixing fair and reasonable prices, designated as Army-Navy Joint Repricing Order No. 1. That order is set out in detail in finding 38. It followed the statute in its provisions, but stipulated that it would not apply to the items covered by the Army Air Forces compulsory order of May 6, 1944, or the Navy's compulsory order No. 2 dated April 27, 1944.

After this order became effective defendant established at plaintiff's plant a cost inspection office for the purpose of discovering such cost changes as might occur from time to time, as well as to receive such suggestions as plaintiff might have to offer for amendments based either upon alleged mistakes or upon changed conditions.

On September 30, 1944, plaintiff sent letters to the Secretary of War and the Secretary of the Navy protesting the joint repricing order.

The prices set out in the repricing order were less than plaintiff's prices and were not satisfactory to plaintiff, and were not agreed to by it. Plaintiff accordingly determined upon a policy, one result of which it hoped would be to force the defendant to rescind the repricing order, or at least to modify it. On October 3, 1944, it sent to its customers a letter which is set out in detail in finding 40. It complained of the terms of the order, said the prices were not satisfactory, indicated that it couldn't comply, and stated that if it reduced its inventory in accordance with defendant's suggestion it could only accept firm orders and required cash in full with such orders. It also indicated changes in some previous orders.

Immediately after the issuance of these notices to its customers plaintiff began the practices outlined in the letter. The adoption of this method of doing business brought a large number of protests and complaints from plaintiff's customers. The complaints were addressed both to plaintiff and to the Services. In some instances customers refused to do business on the new terms, and as a result were faced with nondelivery of plaintiff's products. Delivery of such products fell off sharply during the month of October 1944. Within the next few days there followed a number of strongly worded telegrams between the plaintiff and the Secretaries of War and the Navy in which, among other things, the plaintiff was forbidden to substantially change the terms and conditions of its dealings with its customers.

On October 25, 1944, the defendant, acting through the Secretary of the Navy and pursuant to an Executive Order of the President dated October 24, 1944, seized

and thereafter for a time operated the plaintiff's plants, facilities and business.

During the period October 2 to 25, 1944, plaintiff made shipments under the repricing order and received payment therefor at the prices set out in the order. Accordingly, with respect to the shipments made under the joint repricing order, plaintiff sues in No. 46573 in connection with its prime and subcontracts for the difference between its prices and the order prices for deliveries during the period between October 2, 1944, the date the order became effective, and October 25, 1944, the date of the seizure.

By letter of October 24, 1944, there was transmitted to plaintiff the Secretary of War's determination of reasonable prices for the 61 items ordered to be furnished by plaintiff under its compulsory order dated May 6, 1944. These prices were determined upon the same basis as the prices were for the joint Army-Navy repricing order and were not agreed to by the plaintiff.

Between the dates of the respective orders and October 25, 1944, plaintiff made shipments of the products set out in the Navy compulsory order No. 2, dated April 27, 1944, and the Army compulsory order dated May 6, 1944, and under the two Navy contracts dated June 29 and July 24, 1944. It received pay therefor at the prices heretofore shown as fixed for these orders by the defendant. Suit No. 47328 is to recover the difference between the prices as fixed by the defendant and plaintiff's prices which were in effect at the time of the respective orders, and which had been established and maintained in the manner heretofore indicated.

On the basis of plaintiff's listed and demanded prices it would have received a total of $1,491,584.19 for all of the items involved in these two proceedings. It cost plaintiff $885,954.89 to produce these items, according to the estimate based on the cost analysis which cost was agreed to by plaintiff as correct. Its profit at its prices would have been $605,629.30, or 68.3 percent above cost. The total amount received by plaintiff for all the items in the two proceedings at the prices fixed by defendant was $979,-

050.10, which represented a profit of $93,-095.21, or cost plus a profit of 10.5 percent.

The plaintiff sues in these consolidated cases for the amount of this difference. It claims that the compulsory orders issued by the Army and Navy Procurement Divisions and the joint repricing order constituted a taking under the Fifth Amendment to the Constitution, and that plaintiff is entitled to just compensation for the items taken; that just compensation would require the payment of the list price for the items which plaintiff was compelled to deliver to the defendant's services. The defendant contends, first, that these orders did not constitute a taking of plaintiff's property, and that the defendant therefore was only required to pay a fair and reasonable price for the products delivered. It further contends that even if the action under the orders be construed as a taking of the property, nevertheless the cost plus an average profit of 10.5 percent constituted just compensation under the provisions of the Fifth Amendment.

■ We are inclined to the opinion that there was a taking of plaintiff's property and that he is entitled to just compensation therefor. When the terms of the orders are read in connection with the background of conferences the orders were so complete and the penalties attached to a refusal to deliver so severe as to practically require delivery. Plaintiff had no more choice than the man who was accused of cattle theft in the early days of the West, and who by the Committee of Safety was given a choice as to whether he would be hung or shot. While he couldn't muster up any considerable enthusiasm for either method, he was compelled by force of circumstances to submit.

If plaintiff refused to deliver the items, it was faced not only with severe personal punishment for its responsible officials, but with the taking over of its complete business and industry.

However, in the circumstances of this case we do not think it particularly important whether it be construed as a strongly worded order with which plaintiff reluctantly complied, or whether it be construed as a taking of private property. The net re-

sults as we see them are practically the same.

■ Defendant also raises the issue of the immense volume of plaintiff's business and takes the position that a less return should be had on a large business than upon a smaller one. We can't agree with this philosophy. It is true that in many of the smaller business concerns the personal services of officials are an important element in their success and they sometimes accept small salaries as a contribution to the success of their enterprise. In such instances, a larger percentage of return should be allowed. But aside from this phase we cannot see any great difference in the just percentages to be allowed. There are both advantages and disadvantages in the size of a concern, but much of the strength of this country is intimately linked with important business development.

Plaintiff's successful development of this business is almost a Horatio Alger success story. For 15 years H. C. Lord struggled without profit in an effort to build what he considered a worthwhile business. During that period he and his associate sank many thousands of dollars—he estimates an expenditure of at least $275,000. At any rate, it is certain that he made little if any profit during that period, and was spending large sums of money based upon the faith that was in him. Like many other successful Americans he was trying to rope and securely tie an idea. This effort, together with that of many other people who have contributed to the strength of our country, is largely what has builded our Nation into the strong position it has today. The lure of a reward in the future linked to an omnipotent conviction and a faith in ultimate results does something to a people that we hope may not be lost in the present striving for the Government to furnish security to all its citizens. Along with many other Americans we have an unstinted admiration for the genius, the persistence, and the industry of a man of the type of H. C. Lord.

If these were ordinary times we would feel that since he had gone so many years without profit he would be entitled in justice and fairness to more than an ordinary profit during the years when he was able to show something above the cost of operation. He pioneered the development of an important article and made a great contribution to his country. Anyone who ever rode in a Model T in the days of its innocency, or listened to the heartbeat of an early dollar watch in its struggle to live, can appreciate the importance of checking vibration. It was vitally important in reference to airplanes, which are necessarily constructed of light materials, in which the flower of American manhood was to fly and do battle thousands of feet in the air, the flier's life frequently depending on the accuracy of delicate flight instruments.

■ But these were not ordinary times. It requires no description to make Americans realize that everything they had was involved in the undertaking with which they were faced. Plaintiff contends that its list prices represented the market value; that it could have sold all the items which it could produce at the list price or at a higher price, and that this constitutes the measure of just compensation. There are two fallacies in this position. The Fifth Amendment says nothing about market value. It uses the term "just compensation." It is true that frequently market value is the best yardstick for determining just compensation, and is therefore usually applied where there is a free and untrammeled market. But here there was no such market. As a matter of fact, there was a tremendous shortage of rubber and every pound of that rubber was needed in the war effort. The need was so great that it was completely controlled by allocation. Therefore, unless plaintiff's business were linked to the war effort it could not have secured or used a single pound of rubber. This, together with the fact that the articles themselves were largely controlled by patents which were in the nature of a concession by the Government, it seems to us takes the whole matter entirely out of the field of a free and untrammeled market. Many other facts might be recited as contributing during the emergency to the question of what constitutes just compensation, but certainly it would not be fair when the price of food, the wages of labor and the prices of all other materials going into the war effort

were being controlled, to permit a market value based on what almost amounted to a monopoly, plus a shortage of material elements, to constitute the measure of just compensation. United States v. Cors, 1949, 69 S.Ct. 1086.

■ When the entire record is considered in connection with the circumstances we find that the aggregate amounts allowed plaintiff by the defendant for the items furnished by plaintiff and involved in the two suits were fair and reasonable and constituted just compensation therefor.

It is true that the amounts are below the regular list prices published by plaintiff, but these prices are not necessarily the basis of just compensation in the circumstances.

Every effort was made by the procurement officers to reach agreement on terms, but plaintiff persistently refused to come to terms on any reasonable basis. The profits which plaintiff demanded were all out of line with wartime conditions.

The nation was in great peril—our national life being at stake. People were necessarily attuned to the war effort. Men and women were uncomplainingly permitting themselves to be drafted for all kinds of difficult war jobs. Women and even children were driving tractors in the hot sun to produce and supply the food essential to the world-wide operations of our army and navy and those of our allies. Young men, who had never had a fling at life, were taken from their homes to face hardship and even death on distant fields. Businessmen generally and even plaintiff's competitors were willingly accepting the 10 percent above cost for supplies and equipment needed in the war effort. Every effort was made to mobilize manpower and materials. At such time it is unthinkable that a man would insist on profits of 50 to 100 percent; and it is inconceivable that any court would allow any such profits as just compensation. It is true that plaintiff produced an article of quality. That is to its credit. It is also natural that those who had the responsibility of procuring the equipment for those who were to fight in the air should want the best. But the doctrine that prices may be based on what the traffic will bear has no place in our national economy at such a time.

We are persuaded to believe that plaintiff along with all other contractors will in the long run realize that prices in a national emergency must be kept in the range of reason, and that, insofar as it is practicable, citizens should be treated alike. The price formulae generally adopted by the Secretaries of War and the Navy were almost unanimously accepted by the nation's businessmen during the period in question. We can find no reasonable basis for making an exception of the plaintiff.

The prices paid by the defendant to the plaintiff for the items furnished constitute just compensation.

The petitions are dismissed.

HOWELL, MADDEN, WHITAKER and LITTLETON, Judges, concur.