**SAFEWAY STORES, Inc. v. UNITED STATES.**

**No. 46976.**

United States Court of Claims.

Decided Dec. 5, 1950.

Elisha Hanson, Washington, D. C., for plaintiff. Hanson, Lovett & Dale, Washington, D. C., on the briefs.

Mary K. Fagan, Washington, D. C., with whom was Asst. Atty. Gen., H. G. Morison, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

Plaintiff is a large retail chain store company. It sues for just compensation for

meat which it says the defendant requisitioned from it during the last World War.

After the military authorities began taking meat for their own use, it almost disappeared from the counters of the retail stores. The retail merchant was unable to secure it in anything like adequate quantities to supply the demand of his customers. In this exigency the plaintiff bought first one packing house and then another in an effort to supply its customers.

When it bought its first packing house the defendant was demanding a substantial part of the output of all packers and it continued to do so throughout the war period, during which time about 45 percent of plaintiff's output was required. It was paid therefor the ceiling price established by the Office of Price Administration for wholesale sales, and defendant says this is all it is entitled to. Plaintiff says this price is inadequate to justly compensate it, and that, since it was a retailer and sold its meat at retail, it is entitled to what it could have gotten for it on the retail market.

■ Defendant says, first, it did not take plaintiff's meat in the sense this word is used in the Fifth Amendment. We cannot agree. By set-aside orders, plaintiff was required to hold for the defendant's use certain meat the defendant's agent had selected. It was required to do this under penalties of as much as a $50,000 fine and imprisonment up to three years, and the revocation of its license to do business.

When defendant had definitely decided on the beef it wanted, it issued purchase orders stating the amount desired and the price to be paid therefor, but plaintiff never consented to this price, but protested against it, and reserved the right to demand all it was entitled to under the law.

Plaintiff was under compulsion to deliver the meat demanded and it is entitled to compensation under the Fifth Amendment. See Stahel v. United States, 78 F.Supp. 800, 111 Ct.Cl. 682, 736–743; Id., 336 U.S. 951, 69 S.Ct. 878, 93 L.Ed. 1106.

The more difficult question is the amount of compensation to which plaintiff is entitled.

■ We cannot agree with plaintiff that it is entitled to the price at which it could have sold the meat at retail. The defendant was requisitioning meat from all packers. Substantially none of them, save plaintiff, had retail outlets for their meat. Almost all of them sold only at wholesale. The defendant was liable to them only for the fair and just price which they could have obtained at wholesale. We do not think that plaintiff is entitled to preferential treatment.

It cannot be denied that plaintiff under ordinary circumstances would be entitled to whatever it could secure for its product by skillful marketing. Ordinarily it would be entitled to whatever the market would bring, and if it could raise this price by "dressing up" its product, or in any other way, it would seem it would be entitled to this price. The difficulty, however, is that, while plaintiff had provided for itself this retail market, where prices were higher, the defendant bought not in this market but in the wholesale market. Of all plaintiff's sales, 45 percent of them went to the defendant. In the retail market the plaintiff sold 55 percent of its product, a steak here, a roast there, to thousands of customers; whereas the remainder of its product, 45 percent, was sold to one customer. Manifestly, this one customer, taking nearly one-half of plaintiff's entire output, should not have to pay the same price as the one-steak or the one-roast customer.

So large a customer should pay, it would seem, no more than the wholesale price. It would not seem "just" for the plaintiff to demand more.

■ For another reason plaintiff cannot complain if it receives only the wholesale price: When plaintiff entered the meat packing business it knew the defendant was taking a large part of the output of all meat packers and was paying them therefor only the wholesale price. It knew it would not be permitted to operate if it did not consent thereto, even though under compulsion. It entered into this business with this knowledge.

We think it can claim only whatever is just compensation for its meat on the whole-

sale market. So, in our opinion, the question comes down to what was just compensation on the wholesale market.

■■ Plaintiff has been paid the wholesale ceiling prices declared by the Office of Price Administration. Plaintiff, however, says that these prices are inadequate to justly compensate it because its cost of producing the meat was more than these ceiling prices and, therefore, if paid only these prices, it will sustain a loss, of around a half million dollars. It points also to the commissioner's finding that its business was efficiently run and that, therefore, inferentially at least, its costs must not have been excessive. It says that "just compensation" could not be less than what it cost it to furnish its products to the defendant, these costs having been shown to be reasonable.

This is a strong argument that finds much sympathy in the breast of this Court. However, we are confronted with two opinions of the Supreme Court that make it impossible for us to decide this case accordingly.

The first is United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 92 L. Ed. 1614. Respondent in that case was a meat packer. The United States requisitioned its meat products and Felin & Company found it necessary for good business reasons to replace them. Its cost of replacement was more than what the United States had paid it and it claimed the excess. We gave it the excess, but the Supreme Court reversed us. Three of the justices of that Court said Felin & Company was entitled to no more than the ceiling price. Three denied recovery because they said this company had not been able to show its replacement cost. It was at least intimated that it would have been entitled to its replacement cost, if it had been able to prove it. One concurred in part in both the former opinions. Two justices dissented.

Later, the Supreme Court decided the case of United States v. Commodities Trading Corporation, 339 U.S. 121, 70 S.Ct. 547. In that case two of the justices did not participate, but of the remaining seven, five thought the ceiling prices were controlling in the absence of exceptional circumstances. That opinion must determine our decision here, whatever our own view may be. Plaintiff was paid the ceiling price applicable to those who sold meat wholesale.

■■ However, there is one further thing to be said: All packers were paid a certain subsidy by the Government, because of the fact they had to buy live cattle on a market in which the defendant had found it impracticable to fix controls and had to sell the products therefrom in a controlled market. Not having imposed controls on the packers' "raw material," it gave them a "compensating" subsidy. This subsidy, however, was not sufficient to compensate them for their losses, except for the fact that they realized a profit, not from the sale of meat, but from the sale of by-products of the packing industry, such as materials for the manufacture of glue and soap. Then, to further compensate packers who did not sell these by-products, to them defendant gave an additional subsidy, after November 1, 1943, of 80 cents a hundredweight.

This latter subsidy, however, was denied plaintiff, on the ground that it could recoup its losses through its profits from retail sales. Perhaps this was justified as to the meat it sold at retail, but it obviously was not justified as to the meat it did not sell at retail, but which was taken by the Government at wholesale prices. It would appear that this plaintiff is entitled to no less than this subsidy.

Plaintiff, it is said, however, has no right to sue for a subsidy. Strange as it may seem in a Government of equality before the law, it is said that a subsidy is a grant, a bounty, which the sovereign may withhold from one and give to another. It is said that it is something that cannot be claimed as of right, although it is paid to others similarly situated.

We do not enter upon a discussion of this painful subject. For the purpose of this opinion, but for no other purpose, we may assume that this is true.

However, must we not assume that this subsidy was taken into consideration when the wholesale ceiling price was fixed? Can we not safely suppose that the ceiling price would have been fixed at a higher figure except for this subsidy? If so, since plaintiff

was erroneously denied this subsidy on the meat taken by the defendant, can we not say that this is one of those "exceptional circumstances" in which the ceiling price is not the full measure of just compensation?

As a matter of fact, this subsidy was granted in order to avoid an outright increase in the ceiling price. Indeed, the grant of the subsidy was an increase in the ceiling price to the packers, in fact, though not in name.

. It was deemed preferable to handle the matter this way for this, among perhaps other reasons: If the ceiling price of any commodity in the cost of living index was increased, this gave labor a basis for demanding increased wages. The payment of increased wages would have necessitated raising the ceiling price again, and thus the vicious spiral would have been started. The Government was spending vast sums on war contracts, estimated at between $80,000,000,-000 and $100,000,000,000 a year. If ceiling prices were increased, it would have cost the Government billions of dollars on its war contracts. The grant of subsidies as a means of increasing prices to the packers and other producers, instead of increasing ceiling prices as such, was thought desirable in order to effect these tremendous savings.

It cannot be denied, therefore, that the grant of these subsidies was an increase in the ceiling price to these packers, in fact, although not in name. Since all packers who did not sell by-products, save only plaintiff and others who had retail outlets, got this 80-cent a cwt. subsidy, as a supplement to their selling price, it would seem plaintiff is also entitled to it.

In our opinion, just compensation to this plaintiff is not less than the wholesale ceiling price, which has been paid it, plus the amount of the subsidy all other nonprocessing packers were paid. This puts plaintiff on a parity with all other nonprocessing packers whose products were taken by the Government.

The amount of the subsidy denied plaintiff, but received by similar packers, was $267,779.74. This figure is arrived at by the following computation: The nonprocessors' subsidy of 80 cents per cwt. was paid on a live-weight basis. The ratio of live weight to carcass weight is 1.726585. The live-weight basis for 20,011,670 pounds of carcass beef delivered on Government orders after November 1, 1943, when the nonprocessing subsidy went into effect, at the ratio of 1.726585, is 34,551,850 pounds. At 80 cents per cwt. this amounts to $276,414.80.

Regulation No. 3 of the Defense Supplies Corporation was amended to provide for an increased rate in the basic subsidy of 50 cents per cwt., live-weight basis, effective May 1, 1945, to those slaughterers who were ineligible to receive the nonprocessors' subsidy of 80 cents per cwt. This was terminated June 4, 1945. Since the plaintiff had been denied the nonprocessors' subsidy, it applied for and received this increased basic subsidy on 2,878,354 pounds of beef, live-weight basis, slaughtered between May 1 and June 4, 1945. This increase amounted to $14,391.77. Of this sum approximately 60 percent was applicable to beef delivered under Government set-aside orders during this period, which amounts to $8,635.06 of the total increased basic subsidy.

To put plaintiff on a parity with other nonprocessing slaughterers this must be deducted from the $276,414.80, which leaves a net amount of $267,779.74.

We hold that just compensation to this plaintiff is the wholesale ceiling price, plus the amount of this subsidy, which plaintiff should have received. Judgment for $267,-779.74 will be entered for plaintiff against the defendant.

HOWELL and LITTLETON, Judges, concur.

JONES, Chief Judge, took no part in the decision of this case.

MADDEN, Judge (dissenting).

I am unable to agree with the court's decision awarding the plaintiff $267,779.74, the amount which the plaintiff would have received if it had been paid the subsidy of 80 cents per cwt. which was paid to nonprocessing slaughterers under Regulation No. 3. The plaintiff was not a nonprocessing slaughterer, as defined in the regulation. The regulation was issued as a part of the

process of controlling prices and encouraging production. There was authority for its issuance and, constitutional questions aside, it had the force of law. Yet the court holds that, to be justly compensated for the meat taken from it by the Government, the plaintiff should receive, in addition to the wholesale ceiling price already paid it, the amount of this subsidy.

If the plaintiff is entitled to more than the ceiling price for its meat taken by the Government, because the ceiling price does not constitute "just compensation" under the Fifth Amendment, I still do not see what the amount of the subsidy has to do with the question. This amount does not compensate the plaintiff for its losses, as found by the court, nor satisfy any other test of just compensation which occurs to me. Its allowance must be predicated upon the idea of inequality of treatment as between the plaintiff and others. But, assuming that inequality of treatment would entitle the plaintiff to money to which, under the applicable law, constitutional questions aside, it had no claim, I see no evidence whatever of inequality of treatment. Regulation No. 3 was stated in general terms, applicable to all slaughterers similarly situated. Those who issued it had concluded that if a slaughterer had retail outlets for his meat, his profits would, on the whole, be sufficient without his being given the additional 80-cent subsidy. Those who issued Regulation No. 3 were, presumably, aware that a considerable part of the product of all sizeable slaughterers would not, in fact, be retailed, but would be set aside in carcass form for the armed forces. But the same situation existed with regard to the slaughterers who did not retail, but who processed. All of the large packers did this, and did not, therefore, receive the 80-cent subsidy. Yet, a considerable part of their product was not, in fact, processed, because it went in carcass form to the armed forces.

The promulgators of Regulation No. 3 must have concluded that the processing slaughterers and the retailing slaughterers could, at the permitted sale prices of such of their meats as were not set aside for the armed forces, come out reasonably well on the operation of their business as a whole. We have no evidence that this conclusion was not correct. The evidence relates only to the meat which the plaintiff did not retail because it was set aside for the Government. We do not know how the plaintiff came out on the meat that it retailed. In the difficult and complicated task of keeping a complex economy operating during a total war, it can hardly be a constitutional requirement that Government controls operate so that each item in the inventory of a storekeeper, or each pound of meat produced by a slaughterer can be sold without loss, regardless of the effects of the controls upon the operation as a whole.