**DORE et al. v. UNITED STATES.**

**INTERNATIONAL RICE MILL. CO., Inc.
v. UNITED STATES.**

Nos. 48682, 48683.

United States Court of Claims.

May 1, 1951.

Herman J. Galloway, Washington, D. C., for the plaintiffs. Paul M. Rhodes and King & King, Washington, were on the briefs.

John J. McGinty, with whom was Asst. Atty. Gen. H. G. Morison, for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiffs were millers of rice during the period of commodity price control during World War II. In these suits they seek to recover just compensation for an alleged taking of rice, within the meaning of the Fifth Amendment, through compulsory compliance with Government set-aside orders and forced sale to the Government at certain controlled prices, which so-called sales resulted in losses to plaintiffs.

Rice milling involves the purchase of rough, raw rice; the cleaning, polishing and preparation of that rice for sale; and the distribution into wholesale channels of the milled product. The production and distribution of rice was regulated during the war and immediate postwar period by the Department of Agriculture, and the prices of both rough and milled rice were regulated by the Office of Price Administration. On September 7, 1946, a "miller of rice" was defined as "any person who mills more than 500 barrels of rough rice in any calendar month." [1] Plaintiffs met this definition during the entire period with which we are concerned.

On September 17, 1946, the OPA increased the previously established maximum price of rough rice by approximately $1 per barrel; [2] no simultaneous increase was made in the price of milled rice. Caught between increased raw material costs and an inflexible ceiling on the finished product, plaintiffs and the industry generally were

1. Dept. of Agr., WFO 10; Amdt. 18, issued Sept. 17, 1946.

2. Max. Price Reg. 518, Amdt. 13, issued Sept. 17, 1946.

unable to meet costs of production. Faced with the prospect of selling only at a loss, plaintiffs, through their industry representative, the Rice Milling Industry Advisory Committee, petitioned OPA for an increase in the maximum price of milled rice. An initial request was filed August 15, 1946; a supplemental petition supported by additional cost data was filed October 16, 1946. In response to the initial request for price adjustment, OPA on September 24, 1946, granted an interim increase of approximately $0.50 per barrel in the ceiling price at which milled rice could be sold, specifically recognizing that because of the increased ceiling price granted in rough rice, millers were unable to meet their production costs.[3] In stating the considerations involved in the issuance of the September 24 interim price amendment, the OPA announced, in part:

"It appears from an accounting survey conducted by the Office of Price Administration in 1944 and from other information available to this office that rice millers are not now recovering total costs. Under such circumstances, the Price Administrator is of the opinion that an interim adjustment in maximum prices of finished rice is appropriate in order to cover these two known material costs increases. Such adjustment will assure the industry that the maximum prices for finished rice will generally cover total costs for the product.

"The Rice Milling Industry Advisory Committee is now preparing a petition for adjustment of maximum prices of finished rice * * *. The Price Administrator realizes that a considerable period of time may elapse before the petition has been finally prepared and filed with the Office of Price Administration and a decision reached upon it. The information received as a result of the petition will enable the Administrator to determine the extent of any further adjustment that may be necessary."

Effective November 18, 1946, the OPA, having considered the petitions and data submitted by the industry representative, issued a final order supplanting the interim price amendment and raising the ceiling price on milled rice $0.704 per barrel of rough rice milled and also increasing certain distributor markups. The price thus established was based upon an analysis of the data submitted by the Rice Industry Advisory Committee and was considered by the Administrator to be "generally fair and equitable."[4]

Plaintiffs sold no milled rice through civilian markets after the date of the price ceiling increase on rough rice for the reason that, even with the benefit of the interim increase in price for milled rice, they were unable to meet milling costs. During this period, however, plaintiffs (and the industry generally) were required by order of the Government to set aside 40 percent of their production for sale to Government agencies.[5] Plaintiffs did this, and during October 1946 delivered 3,240,000 pounds of the set-aside rice to Commodity Credit Corporation, a Government purchasing agency, upon its order. The Government paid for the rice at the prevailing OPA ceiling price, which included the interim increase granted September 24, 1946. Plaintiffs complied with the set-aside order of the OPA and sale orders of the Commodity Credit Corporation because failure to do so would have subjected them to civil penalties amounting to business death and, for a wilful violation, to criminal prosecution.

Two questions are presented. The first is whether or not defendant's "purchases" under compulsory set-aside orders constituted a "taking" for which just compensation must be paid, as required by the Fifth Amendment to the Constitution. The second is whether or not, if there was a "taking," the interim price already paid to plaintiffs amounts to "just compensation." The Government contends that the transactions here were strictly "sales" and—not a "taking"—of plaintiffs' rice and that, even if a "taking," the plaintiffs have already received just compensation, within the meaning of the Fifth Amendment, for their losses inasmuch as they have been paid an

---

3. 2d Rev. MPR 150, Amdt. 17, Sept. 24, 1946.

4. 2d Rev. MPR 150, Amdt. 20, Nov. 18, 1946.

5. WFO 10, Amdt. 10, Sept. 17, 1946.

amount for the rice computed on the bases of OPA maximum prices (interim prices) prevailing at the date and place of taking.

The plaintiffs contend that they did not sell their product voluntarily or willingly but were compelled to part with their rice involuntarily and that the transactions were thus "takings" rather than "sales" and that the amounts paid for the rice on the basis of the interim price were not "just compensation" therefor, but an amount less than the fair value of the rice and so small that, excluding all considerations of profit, an out-of-pocket loss was incurred in the milling of the actual rice supplied the Government.

■■■ Did plaintiffs make an ordinary "sale" of their rice to the Government as it contends? A. "sale" implies willing consent to the bargain. A transaction although in the form of a sale, but under compulsion or duress, is not a sale. Cf. Liggett & Myers Tobacco Co. v. United States, 274 U.S. 215, 47 S.Ct. 581, 71 L.Ed. 1006. When, as here, the United States exercises its authority to order delivery and in its sovereign capacity forces the "sale" of property to it for public use there is, in our opinion, a "taking" and just compensation must be made. It is true that the Government did not go through the formal proceedings of requisitioning the rice, but the plaintiffs knew that they had to sell and deliver according to the Government's order or face requisition plus penalties. Plaintiffs did not wish to court the greater detriment, nor delay supplies to the Government by demanding formal requisition. Plaintiffs complied with the Government orders but noted their protest and reserved as best they could their right to seek later what they deemed to be a fair price. We think the record clearly establishes the fact that the Government, in the exercise of unquestioned wartime powers, forced a "sale" of this rice to it. This was a taking of the rice by the Government for public use.[6] The Constitutional right to just compensation is a matter of substance and is not contingent upon the form by which the Government chooses to acquire the property.[7]

The next question relates to the matter of just compensation. Plaintiffs, having shown that payment based upon the OPA interim price resulted in an actual out-of-pocket loss to them, claim that the price paid did not amount to the "just compensation" guaranteed by the Fifth Amendment to the Constitution. They urge the price paid should have been computed on the basis of the "fair value" of the rice as established by OPA effective November 18, 1946, on the basis of industry cost studies to that date. Defendant does not contest the fact that plaintiffs' actual costs on the rice taken exceeded the amount received from the Government for it, nor does it offer any proof of its own as to "fair value," but contends that just compensation is the OPA maximum price actually in effect on the date of taking, which, in this case, was the interim price set September 24, 1946, pending the results of an industry cost study. The latter price has already been paid plaintiffs; suit here is for the balance between OPA interim price at time of taking and OPA price established by the OPA price order of November 18, 1946. The record in this case shows that it was manifest to the OPA officials that their price before the interim increase was not sufficient to compensate the plaintiff and that the interim price regulation amendment was an attempt, as its language shows, to give in advance at least a portion of the increased costs being incurred by the millers, and this is not denied; and it is admitted that such amendment did not accomplish this result in these cases.

■■■ The Fifth Amendment to the Constitution provides that private property shall not be taken for public use without just compensation. Just compensation is the monetary equivalent of the property taken, and the determination of that amount

6. Safeway Stores, Inc. v. United States, 93 F.Supp. 900, 118 Ct.Cl. ——.

7. Lord Manufacturing Co. v. United States, 84 F.Supp. 748, 114 Ct.Cl. 199; Stahel & Co. v. United States, 78 F.Supp. 800, 111 Ct.Cl. 682, 742.

which shall be such equivalent has been held to be a judicial function.[8]

■ In determining what is "just compensation," each case must be decided upon its individual facts; no formula, no rigid rules exist for determining what is "just compensation" under all circumstances and in all cases.[9] Courts are guided by their conclusions by certain broad principles, well known, often quoted, and often difficult of application in specific instances. It is held that the war power does not repeal or suspend the requirements of the Fifth Amendment.[10] It is held, generally, that just compensation is the value of the property in a free, open market,[11] and that the value is determined as of the date of taking.[12] Gain to the taker is held immaterial, loss to the owner being considered a good measure of value.[13] Where there is a market at time of taking, original or replacement costs are not usually elements of just compensation, nor is speculative "retention value."[14] Just compensation may include all elements of value that inhere in property, but it does not exceed market value fairly determined,[15] nor does it include incidental or indirect losses.[16] When there is a free market at time and place of taking, the prevailing price therein is just compensation.[17]

■ When the market upon which a commodity is bought and sold is a controlled market, there exists a strong presumption that the controlled price, fixed pursuant to law, is fair and equitable and that such price is the proper measure of just compensation within the meaning of the Fifth Amendment. This is so because the basic price control legislation enacted in 1942,[18] and in effect during the entire period of this claim empowered the Price Administrator to establish such maximum prices as would in his judgment be generally fair and equitable and would effect the purposes of the Act, as stated therein: Section 1.(a) * * * to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices * * *; and to permit voluntary cooperation between

8. Monongahela Navigation Co. v. United States, 148 U.S. 312, 325–328, 13 S.Ct. 622, 37 L.Ed. 463.

9. Cf. United States v. Commodities Trading Corp., 339 U.S. 121, 123, 70 S.Ct. 547, 94 L.Ed. 707; Lord Manufacturing Co. v. United States, supra, n. 8; Monongahela Navigation Co. v. United States, supra, n. 9; Kimball Laundry Co. v. U. S., 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765.

10. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; Oro Fina Consolidated Mines, Inc., v. United States, 92 F.Supp. 1016, 118 Ct.Cl. ——.

11. United States v. Miller, supra, n. 11.

12. Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934.

13. United States v. Miller, supra, n. 11.

14. United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 92 L. Ed. 614; United States v. Commodities Trading Corporation, supra, n. 10.

15. Olson v. United States, supra, n. 11.

16. United States v. John J. Felin & Co., supra, n. 15.

17. United States v. New River Collieries Co., supra, n. 15.

18. Emergency Price Control Act of 1942, 56 Stat. 23, 24, 50 U.S.C.A.Appendix, § 901 et seq.

the Government and producers, processors, and others to accomplish the aforesaid purposes. * * *" To effectuate congressional intent that controlled prices be fair and equitable, a procedure for administrative appeal from alleged unjust ceiling prices was provided for within the OPA, with a further right of appeal for judicial relief from an adverse agency determination to the Emergency Court of Appeals, which was given exclusive jurisdiction in such cases.[19] Thus, a promulgated OPA price was, in effect, an administrative determination that such price was fair and equitable, and the acceptance of that price by those affected without exhaustion of the right of appeal became strong corroborative evidence. Similarly, the determination by the Emergency Court of Appeals that a particular price was fair and equitable, even though not *res judicata* on the question of just compensation, would have the practical effect of foreclosing much doubt about that price being also the measure of just compensation; for a truly fair and equitable price would be just compensation.

However, it has never been held that the fixed price of a commodity in a controlled market is binding upon the courts as a measure of just compensation.[20] To so hold would require the assumption that, notwithstanding the circumstances, the controlled price is always a fair and equitable price and the equivalent of just compensation. Such an assumption would encounter at least two constitutional difficulties. The first would be that a court proceeding on such an assumption would be abandoning its judicial function in allowing the legislature under delegated authority to decide both the property to be taken and the amount to be paid as just compensation. Even though the price were controlled by one agency and the property taken by another agency and the price controlling agency acted independently of the taking agency, such an abdication would appear to be incompatible with basic conceptions of the separation of powers in government and with the Court's decision in Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463.

The second difficulty with conclusively presuming an OPA price to be just compensation would be that, in order to be constitutional under such an interpretation, it would have to be computed so as to yield just compensation in every case, because if just compensation and ceiling price are necessarily identical, the controlled price must be high enough to guarantee to owners of requisitioned property the monetary equivalent of the property taken. One of the bases for upholding the Emergency Price Control Act of 1942, 56 Stat. 23, was its provision in Section 4(d) that, "Nothing in this Act shall be construed to require any person to sell any commodity * * *." It was thus held that a person who could not sell at the controlled prices without losing money did not have to sell, and so lost nothing—at least in theory.[21] Had the Act compelled producers or owners to market their commodities at the controlled price, the Act itself, might have constituted a taking of private property for public use, and the question of just compensation would have had to have been fought out on each of the thousands of items sold under such controlled price conditions. The necessity for such litigation was wisely eliminated by the requirement that maximum prices promulgated be generally fair and equitable; by providing for administrative and judicial review thereof, and by providing that no one should be forced to sell at the price established. Congress thus avoided any "taking," but chose, rather, to set the price at which a commodity had to be sold, if sold at all, and let economic rather than legislative pressure cause commodity holdings to go upon the market. Thus, a seller might pursue relief from inequitable ceilings under the Act, but he could not claim that the price eventually set had to be just compensation to him, because he

19. Secs. 203 and 204, 56 Stat. 23, 31–33.

20. Cf. Lord Manufacturing Co. v. United States, 84 F.Supp. 748, 114 Ct.Cl. 199, 268, where less than the market value was construed to be "just compensation."

In that case cost plus 10 percent profit was deemed "just compensation."

21. Yakus v. United States, 321 U.S. 414, 431, 64 S.Ct. 660, 88 L.Ed. 834.

was not forced to part with anything except by the circuitous route of economic starvation. Under this theory the Act avoided the question of fixing the Constitutional just compensation for thousands upon thousands of separate items. Instead, when the Government actually requisitioned some commodity, just compensation for the particular item taken was then determined. So long as the Government did not take any commodity for public use, the seller on the controlled market was confined to claiming a price that was *generally* fair and equitable. That it might be unfair to individuals was not fatal.[22]

In each of the cases, regarding the measure of just compensation for a commodity taken for public use under controlled market conditions, to reach the Supreme Court, the prevailing OPA price at the time and place of taking has been upheld as the proper measure of just compensation. In United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed. 614, three justices supported the OPA price upon the ground that the plaintiff had not proved an actual loss; three justices suggested that for a perishable commodity (pork products) taken in a controlled market, any price other than the established one was illusory, and *if that price had not been set aside by direct attack,* it became the only relevant measure of just compensation because it was the only price at which the commodity could have been bought or sold; one justice thought that the only loss shown beyond the awarded ceiling price was for consequential damages, which are not proper elements of just compensation; two justices dissented on the theory that the OPA price was not necessarily equivalent to just compensation and that in the absence of a free market other factors (such as replacement or original cost, etc.) should be considered.

In United States v. Commodities Trading Corporation, 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707, the OPA price was again sustained in spite of individual hardship, the majority holding that the established price was fair and equitable and that plaintiff's claim for more than the OPA price was based upon the inclusion of prospective profits from holding, whereas the proper consideration was market value at the time and place of taking. "Retention" value was considered too speculative an ingredient for inclusion as an element of just compensation.

Salient features of both the Felin and Commodities cases are that the records therein did not convince the Supreme Court that the OPA maximum price was generally unfair or inequitable or that plaintiffs had, anticipated profits aside, suffered an actual financial loss upon the commodities taken. Nor had either of these plaintiffs exhausted the remedies prescribed in the Emergency Price Control Act. Plaintiff in the Felin case appealed administratively, but acquiesced in the final OPA adverse decision and did not seek judicial relief in the Emergency Court of Appeals. Plaintiff in the Commodities case negotiated with OPA for higher ceiling prices, but never sought a judicial or even a formal administrative determination that the price set was unfair or inequitable. When these cases reached litigation on the question of just compensation, the courts were faced with the presumption, created by the OPA's administrative determination, that the established prices were generally fair and equitable.[23] The Supreme Court, considering a fair and equitable price to be just compensation and concluding that OPA prices should be accepted as *prima facie* fair and equitable, held that plaintiffs must bear the burden of proving otherwise. The Court held that those plaintiffs failed to do so.

22. Bowles v. Willingham, 321 U.S. 503, 516–517, 64 S.Ct. 641, 88 L.Ed. 892.

23. Sec. 2(a) of the Emergency Price Control Act of 1942, 56 Stat. 23, 24–25, set up certain criteria to be considered by the Administrator in establishing maximum prices. The same section required each regulation and order to be accompanied by a "statement of the considerations involved in the issuance of such regulation or order", and required the price set to be one "generally fair and equitable" in the judgment of the Administrator. Thus, the establishment of an OPA price was an administrative determination that that price was generally fair and equitable.

The instant case is factually different. At the times in October 1946, when plaintiffs' rice was taken by defendant, an interim OPA price had been in effect since September 24, 1946. The interim price had been approved by OPA because it was recognized that producers were not recovering costs of production after the OPA-approved price rise in raw rice. Cost data and a petition for an increased price ceiling had been under consideration since August 15, 1946, a revised application and additional cost data having been submitted October 16, 1946. One million, one hundred forty thousand pounds of milled rice moved from the plaintiffs Dore Rice Mill to defendant between October 8 and 16, 1946; two million, one hundred thousand pounds moved from the plaintiff International Rice Milling Company to defendant between October 4 and 25, 1946. All was paid for at the interim OPA price for milled rice. As appears more particularly in findings 17 and 23, this price resulted in plaintiffs Dore Rice Mill sustaining a loss of $4,701.80 and in plaintiff International Rice Milling Company sustaining a loss of $30,000, said amounts representing actual out-of-pocket losses on the rice taken, and containing no allowance for reasonable profit.

On November 18, 1946, the OPA issued, effective that day, a final upward revision of ceiling prices for milled rice.[24] The revision was not made retroactive, but the Price Administrator's statement of considerations[25] justifying the further increase in the maximum price of milled rice, recognized that an interim increase had been granted to give "a certain amount of relief" to the industry in the interval before a final adjustment could be made. In stating the considerations involved in the issuance of the final upward revision, the Administrator also pointed out that a careful analysis of the recommendations submitted by the Advisory Committee had been made and that the prices thus finally established were generally fair and equitable. The November 18, 1946, revision raised the price of milled rice by approximately $0.704 per barrel of rough rice milled, and increased the markup for primary distributors by $0.04.

Since a price increase of $0.704 per barrel was deemed necessary by OPA to arrive at a fair and equitable market price, it follows that the interim price adjustment of approximately $0.50 per barrel was not considered fair and equitable by OPA for the industry generally, and in plaintiffs' case we have found that it resulted in an actual loss. The $0.50 increase was admittedly designed in stop-gap fashion only to keep the rice millers in business until a considered determination could be made. On November 15, 1948, after a proper study had been made, it was the Price Administrator's determination that the price should be increased $0.704 per barrel. If rice millers voluntarily sold any rice at the interim price, the loss, if any, was not recoverable, for there was no taking. As to the rice taken by the Government by means of the set-aside order and forced sale, however, the Government must make "just compensation," and this court has been called upon to determine the amount thereof.

Cost to the owner is never the sole measure of just compensation when property is taken for public use. Here, however, the record shows that plaintiffs purchased raw rice at a governmentally controlled price and milled it at a cost admittedly reasonable. What the Government actually took was plaintiffs' raw rice plus plaintiffs' milling services. Where, as in this case, cost is clearly established and at the same time shown to be in all respects reasonable, it becomes an important factor in the determination of what is just compensation, and one that should be considered and related to other indications of value. This is particularly true when the preferred *criteria* of an open market is not available. Where the price paid fails to return to the owner the fair cost to him of the raw commodity plus the reasonable value he has added thereto by the employment of his capital and labor, it cannot be said that the owner has been justly compensated.

24. 2d Rev. MPR 150, Amdt. 20, Nov. 18, 1946.

25. See n. 24, supra.

The defendant submitted no proof to challenge the plaintiffs' evidence or to set up its own measure of just compensation and took no exception to the Commissioner's findings as to the cost and reasonable and fair value of the rice in question, which findings the court has substantially adopted. Rather, the defendant chose to rely solely upon the legal proposition that the maximum price prevailing in a controlled market upon the date of taking is the only acceptable measure of just compensation. As has been pointed out, we do not agree that this is necessarily true. Just compensation is a question to be determined by a consideration of all the available facts in each case. We assume, nevertheless, that defendant has no serious quarrel with plaintiffs' proof as to the cost and reasonable value of the rice, and from the record before us we accept the plaintiffs' figures, which seem reasonable and are unchallenged.

In our opinion, under the special circumstances of this case, the OPA interim price in effect at the time plaintiffs' rice was taken is entitled to little evidential weight in our determination of just compensation. It was a guess—an arbitrary figure which OPA hoped would afford some relief to millers until a reasoned determination could be arrived at. It was a guess from which there could be no appeal, because the only appealable question (proper price, that is, "fair and equitable" price) was already under consideration. Any decision on ultimate price would immediately make moot the question of adequacy of interim price. It was a guess shown to have been unfair by direct attack within OPA, for the Price Administrator's final decision bore out the soundness of plaintiffs' position—although too late to be of financial benefit to them.

Conversely, we think the latter, final OPA price, a considered administrative determination based upon a study of industry costs, supported by plaintiffs and unchallenged by defendant, is entitled to great weight, and we have relied upon it in deciding that such price was fair and equitable, not only for the effective date and thereafter, but also for the immediately preceding period, since it was the study of industry costs during that period that served as the basis for the final determination. The price established in November for future sales was based upon data compiled and submitted between August and October, 1946, after the price rise in raw rice and dealt with market conditions under which the very rice in question had been produced. The "fair value" of milled rice in October, under virtually identical market and production conditions as existed in November, must have been approximately the same as its "fair value" in November. The price paid to plaintiffs by defendant for the rice taken was less than fair and equitable; it was less than just compensation, which we conclude to be an amount computed upon the basis of the OPA maximum price promulgated November 18, 1946.

Defendant, between October 8 and 11, 1946, took from the plaintiffs Dore Rice Mill 400,000 pounds of rice to the fair and reasonable value of $39,974.50. Defendant paid plaintiffs $37,615.50 for the rice under contract No. Aw–f(F)54443. Suit for the difference between these amounts, $2,359 constitutes the first cause of action under case No. 48682, and judgment in that amount will be entered for plaintiffs, together with an additional amount measured by interest at 4 percent from October 11, 1946, not as interest but as a part of just compensation.

Defendant, between October 14 and 16, 1946, took from the plaintiffs Dore Rice Mill 240,000 pounds of rice to the fair and reasonable value of $24,331.20. Defendant paid plaintiffs $22,852.80 for this rice under contract No. A5pm(Ff)–34. Suit for the difference between these amounts, $1,478.40 constitutes the second cause of action under case No. 48682, and judgment in that amount will be entered together with an additional amount measured by interest at 4 percent from October 16, 1946, not as interest but as a part of just compensation.

Defendant, between October 23 and 31, 1946, took from the plaintiffs Dore Rice Mill 500,000 pounds of rice to the fair and reasonable value of $49,381. Defendant paid plaintiffs $46,539 under contract No. A5pm(Ff)–35. Suit for the difference between these amounts, $2,842 constitutes the third cause of action under case No. 48682, and judgment in that amount will be en-

tered for plaintiffs, together with an additional amount measured by interest at 4 percent from October 31, 1946, not as interest but as a part of just compensation.

Defendant, between October 4 and 14, 1946, took from plaintiff International Rice Milling Co. 1,000,000 pounds of rice to the fair and reasonable value of $89,581.50 Defendant paid plaintiff $84,674.50 for the rice under contract No. AW–(F)–54435. Suit for the difference between these amounts $4,907 constitutes the first cause of action under case No. 48683, and judgment in that amount will be entered for plaintiff therein together with an additional amount measured by interest at 4 percent from October 14, 1946, not as interest but as a part of just compensation.

Defendant, between October 10 and 25, 1946, took from plaintiff International Rice Milling Co. 1,100,000 pounds of rice to the fair and reasonable value of $94,854.50. Defendant paid plaintiff $87,429.50 for this rice under contract No. A5PM(FF–2). Suit for the difference between these amounts, $7,425 constitutes the second cause of action under case No. 48683, and judgment in that amount will be entered for plaintiff therein together with an additional amount measured by interest at 4 percent from October 25, 1946, not as interest but as a part of just compensation.

It is so ordered.

JONES, Chief Judge, and HOWELL, and WHITAKER, Judges, concur.

MADDEN, Judge (dissenting).

I agree with the Court in its conclusion that the compulsory "set aside orders" constituted a taking by the Government, which required it to pay just compensation. I do not agree that what was paid was less than just compensation.

At the time of the taking there was in effect a ceiling price for milled rice, fixed by the Price Administrator. To be sure, it was an "interim price" increasing the former ceiling price by 50 cents a barrel, and issued in contemplation of the fact that a further study was to be made, after which study it would be determined whether a further change would be made in the ceiling price. Such a change was made some two months later, the ceiling price being further increased. The "interim price" was, however, for the time that it was in effect, the lawful price, and the only price at which a private sale of rice could be lawfully made.

The Supreme Court, in the case of United States v. Commodities Trading Corporation, 339 U.S. 121, 125, 70 S.Ct. 547, 550, 94 L.Ed. 707, said, after analyzing the pertinent provisions of the Price Control Act, "We think the congressional purpose and the necessities of a wartime economy require that ceiling prices be accepted as the measure of just compensation, so far as that can be done consistently with the objectives of the Fifth Amendment". That holding eliminates from a case such as the one before us all questions of legislative intent or statutory interpretation and leaves only the question whether the Fifth Amendment requires that the Government pay more for the requisitioned rice than it paid in this case. The only suggested basis for such a constitutional requirement in this case is that the ceiling price paid was less than the cost to the plaintiffs of the rice taken. It is, of course, elementary that just compensation may be greater or less than the cost to the owner of the thing taken. Hence it must be urged, to justify the Court's decision, that in the case of the taking of property for which there is a ceiling price, at least cost must be paid, although in the case of the taking of property for which there is a free market price, it need not be paid, but that argument is no longer open for our consideration. It was made and expressly rejected in the Commodities Trading Corporation case, supra. This Court had in that case, 83 F. Supp. 356, 113 Ct.Cl. 244, made a finding that the cost to the owner of the commodity there taken was almost twice the amount paid by the Government, on its requisition. The Government disputed that finding, in the Supreme Court, but the Court held that it was unnecessary to resolve that factual dispute, since, whatever the owner's costs may have been, the ceiling price was just compensation for the taking. 339 U.S. at page 130, 70 S.Ct. 547, 94 L.Ed. 707. I see no distinction between that case and the instant one, and would hold that the plaintiff is not entitled to recover.