### NORTHERN HELEX COMPANY

v.

### The UNITED STATES.

No. 454–70.

United States Court of Claims.

Oct. 22, 1980.

---

Clarence T. Kipps, Jr., Washington, D. C., attorney of record, for plaintiff. John Lloyd Rice, Miller & Chevalier, Washington, D. C., F. Vinson Roach and Dean W. Wallace, Omaha, Neb., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. John D. Trezise, Dept. of the Interior, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KUNZIG and SMITH, Judges, en banc.

1. The necessary findings of fact are contained in this opinion.

## ON DEFENDANT'S EXCEPTIONS TO THE TRIAL JUDGE'S OPINION

FRIEDMAN, Chief Judge:

This is the third time this case has been before us. It involves the amount of damages to which the plaintiff is entitled for the government's breach a decade ago of a contract under which the plaintiff agreed to produce and supply helium to the government. The government has challenged the recommended decision of Trial Judge Spector, rendered on remand following our reversal of his prior decision awarding damages that we held were excessive because based on erroneous legal principles. In his latest decision the trial judge ignored our prior decision and recommended that damages be awarded on the same legal theories that we rejected in the prior case, but in a significantly greater amount than he previously had recommended.

We hold that our prior decision is the law of the case, and we follow it. We conclude, however, that the government has failed to prove one element for which we ruled in our prior decision that damages could be reduced.[1]

### I.

The government's termination of the helium purchase program, of which the plaintiff's contract was a part, has been the subject of substantial litigation, both in this court and in others. *See Northern Helex Co. v. United States (Northern Helex II)*, 207 Ct.Cl. 862, 524 F.2d 707 (1975), *cert. denied*, 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976); *Northern Helex Co. v. United States (Northern Helex I)*, 197 Ct.Cl. 118, 455 F.2d 546 (1972); *Phillips Petroleum Co. v. United States*, No. 248–76 (Ct.Cl. Sept. 12, 1980); *Cities Service Helex, Inc. v. United States*, 211 Ct.Cl. 222, 543 F.2d 1306 (1976); *National Helium Corp. v. Morton*, 486 F.2d 995 (10th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *National Helium Corp. v. Morton*, 455 F.2d 650 (10th Cir. 1971). It

is unnecessary to restate all of the facts pertaining to the helium purchase program; instead, we sketch the basic factual history and describe the procedural situation relevant to our decision.

In 1961, the government entered into longterm contracts with four natural gas producers[2] to obtain helium, a by–product of natural gas production, which it wanted for conservation purposes. The four producers constructed helium processing plants as part of integrated natural gas production facilities. In 1969, the government ceased paying the amounts due under the contracts, and in 1970, Northern Helex brought suit in this court, alleging a breach.[3] Because of the integrated nature of the plaintiff's operations, it has necessarily continued to use its helium plant to remove helium from the natural gas. In some instances, it found another purchaser for the helium; on other occasions, it has justifiably vented the helium into the atmosphere as a waste product.

In *Northern Helex I, supra,* we held that the government had materially and totally breached its contract with Northern Helex and that Northern Helex had not waived the breach and was justified in treating the contract as terminated. 197 Ct.Cl. at 134, 455 F.2d at 555–56. We expressly left open all issues relating to damages and returned the case to the Trial Division for an initial determination of those issues.

**2.** The plaintiff and the trial judge both state that the court has confused the identity of the plaintiff in this lawsuit by not distinguishing between Northern Helex (the plaintiff) and Northern Natural Gas (its parent). We understand the relationship between the plaintiff and its parent and their respective roles in the transactions involved. For ease of presentation here, however, we will treat them as a single entity when discussing the factual background of the case.

**3.** In 1971, the government announced that it was terminating all four contracts, at which point the other three producers brought suit in district court seeking specific performance. Subsequently, separate suits seeking damages for breach have been filed in this court by the other three companies.

Trial Judge Spector thereafter recommended that the plaintiff recover the full contract price, including the costs of continued performance, for the remainder of the contract term, less the amounts received from sales to a third party after the breach, storage expenses, and payments made for deliveries after suit was filed. 20 Cont.Cas. Fed. 89,085, 89,132 (Ct.Cl. Trial Div.1974). On *en banc* review of that recommended decision, however, the court "reach[ed] a somewhat different result." *Northern Helex II, supra,* 207 Ct.Cl. at 868 n.1, 524 F.2d at 709 n.1.

We held that "the plaintiff is not entitled to recover its cost of performance ... of the contract to the end of the contract period" (*id.* at 878, 524 F.2d at 715), that the price escalation clause in the contract, triggered by changes in the wholesale price index, was inapplicable, and that certain excess values, at that time not yet demonstrated, would be nonrecoverable by the plaintiff. We set forth a six–step process[4] for determining the damages to be awarded (*id.* at 888–90, 524 F.2d at 721–22), and remanded the case for the trial judge to make the recommended findings of fact and calculations necessary to carry out that six–step process.

On remand, however, the trial judge made no attempt to comply with our explicit instructions for computing damages. Instead, he returned to the theory of damages that we rejected in *Northern Helex II.*[5] He

**4.** We required the determination of two types of excess values, which were to be added together and then added to the stipulated anticipated manufacturing costs ($43,067,413). That sum was to be subtracted from the anticipated revenues between the breach and the end of the contract term (which the court held to be $80,255,000) to yield anticipated profits. From anticipated profits would be subtracted the proceeds of the sale to a private purchaser ($2,872,547 less expenses) and any savings accruing to the plaintiff because of the breach.

**5.** The trial judge accepted our basic holding that common–law rules of contract damages apply, under which the injured party is to be put in as good a position as he would have been in if the contract had been completely performed. 207 Ct.Cl. at 875, 524 F.2d at 713.

stated that "[o]nly payment of the contract price, reduced by the proceeds of any resale of helium to others, will place the plaintiff in as good a position as it would have been in had the contract been fully performed" (which is the admitted standard, *see* note 5, *supra*). He then recomputed the damages, using the same method he had used in his first opinion and that we had explicitly rejected in *Northern Helex II.* He increased the total damages to reflect changes in the wholesale price index that triggered the contract's escalator clause (which we had held does not apply in the event of breach). The trial judge recommended an award to the plaintiff of $94,-839,000, "subject to further adjustment by reason of proceeds received by plaintiff on the resale of helium to others subsequent to December 24, 1970."

## II.

It is "familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid to rest." *Federal Communications Commission v. Pottsville Broadcasting Co.*, 309 U.S. 134, 140, 60 S.Ct. 437, 440, 84 L.Ed. 656 (1940). "[A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pennsylvania Railroad Co.*, 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948). After an appellate court has decided a case and remanded to a lower court, the latter court "is bound by the decree as the law of the case; and must carry it into execution . . . . That court cannot vary it, or examine it for any other purpose than execution; . . . or review it, even for apparent error, upon any matter decided on appeal . . . ." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895). Indeed, the rule that a lower court must carry out the mandate of an appellate court is so well established that a writ of mandamus may issue to compel such action. *General Atomic Co. v. Felter*, 436 U.S. 493, 497, 98 S.Ct. 1939, 1941, 56 L.Ed.2d 480 (1978); *In re Sanford Fork & Tool Co., supra.*

■ The obligation of a lower court to carry out the mandate of an appellate court exists where the appellate and lower tribunals are separate and independent judicial bodies. *A fortiori*, a trial judge of this court, who is not an independent judicial entity, has the same obligation.

In the present case, Trial Judge Spector blatantly disregarded this settled principle in considering this case following our remand in *Northern Helex II.* Instead of carrying out the duties that our judgment directed him to perform, he simply ignored our decision and proceeded instead to decide the case as he deemed proper and as if our decision never had been rendered. For example:

Although we directed that in determining the plaintiff's anticipated profits from the contract there must be subtracted from the total anticipated revenues under the contract of $80,255,000 "the total stipulated anticipated manufacturing costs of $43,067,-413 that the plaintiff would have expended to the end of the contract term" (207 Ct.Cl. at 887, 524 F.2d at 721–22 (1975)), the trial judge did not make the subtraction.

Although we directed that the Wholesale Price Index escalation clause of the contract "should not be applied after the date of the breach" (207 Ct.Cl. at 890, 524 F.2d at 722), the trial judge applied the escalation clause and thereby substantially increased the damages.

Although we directed that the plaintiff's anticipated profits on the contract should be "discounted to current value as of the date of entry of final judgment" (207 Ct.Cl. at 890, 524 F.2d at 722), the trial judge concluded that "[a]t this late date in the term of a 22–year contract, no 'discount to present value' is warranted."

Although we directed that there should be subtracted from the plaintiff's total anticipated revenues under the contract any excess value of the helium plant at the time of breach (207 Ct.Cl. at 889, 524 F.2d at 721), the trial judge ruled that "so–called 'excess values' have no relevance whatever in the event of a total and material breach

of contract by the Government." (We discuss the excess value issue in section III.B. below.)

The result of the trial judge's failure to comply with our decision was that although in his prior decision he recommended damages of $78,012,142, which we rejected as excessive because based upon erroneous legal theories, in his decision on the remand he applied those same rejected legal theories and this time recommended damages of more than $94 million. This was $16 million greater than his previous award, which we had found was excessive.

The ostensible justification the trial judge gave for this extraordinary action was that portions of our opinion in *Northern Helex II* were inconsistent with our opinion in *Northern Helex I*. We discern no inconsistency. The trial judge's contrary view stems from his taking certain statements in *Northern Helex I* out of context and then treating them as the rationale of that decision. In any event, if there were any inconsistencies, the latter opinion, *Northern Helex II*, would have to be viewed as overruling or modifying *Northern Helex I sub silentio*. It was not the province of the trial judge to ignore the critical and considered rulings in *Northern Helex II* because he deemed them inconsistent with the earlier decision or found them unconvincing. If the trial judge had any doubt about what *Northern Helex II* held or required him to do on the remand, he could have requested further guidance from the court.

Trial Judge Spector obviously believed that our decision in *Northern Helex II* was wrong and that his prior recommended decision that we reversed was correct. We assume that it is not unusual for a trial judge to believe that an appellate court's reversal of his decision was erroneous, and perhaps grossly so. That belief, however, provides no justification for the trial court's refusal to comply with the appellate court's instructions.

We expect and insist that the trial judges of this court comply with the instructions and orders of the court, whatever may be their personal view of those rulings. If a trial judge is unable to do so as a general matter, the appropriate course for him would be to submit his resignation. He cannot, however, consistent with his obligations as a trial judge of this court, ignore or fail to comply with the directions of the court merely because he disagrees with them or believes they are wrong.

### III.

■ A. Although the plaintiff argues that our decision in *Northern Helex II* was erroneous and urges us not to follow it, the threshold question is not the correctness *vel non* of that decision, but whether that decision is the law of the case and therefore binding upon us. We conclude that it is.

In our recent opinion in *United States v. Turtle Mountain Band of Chippewa Indians*, 222 Ct.Cl. ——, 612 F.2d 517 (1979), we undertook an in-depth exploration of the law-of-the-case doctrine. What we stated there applies equally to this case.

The issue in *Turtle Mountain Band* was the correctness of our earlier decision with respect to the date of extinguishment of the plaintiff Indians' aboriginal title to a certain tract of land. We did not reach the merits of the government's claim that we had erred in our first determination on this point; instead, we regarded that determination as the law of the case and therefore binding, and declined to consider any of the government's substantive arguments. We described the law-of-the-case principle as "a matter of sound judicial practice, [under which] a court generally adheres to a decision in a prior appeal in the same case unless one of three 'exceptional circumstances' exists: 'the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.'" *Id.* 222 Ct.Cl. at ——, 612 F.2d at 521 (quoting *White v. Murtha*, 377 F.2d 428, 431 (5th Cir. 1967)). Since none of these exceptions was present, our initial determination was thus "impervious to challenge on subsequent appeals." *Id.* 222 Ct.Cl. at ——, 612 F.2d at 520.

Again in this case, our previous decision controls unless one of the three exceptions exists. We need to explore here only one of these three exceptions. There has been no change in the applicable law since *Northern Helex II*. Although the trial judge conducted a second evidentiary hearing and made an additional 106 findings of fact, the facts now before us relating to the issues we decided in 1975 are essentially the same as those we then considered.[6]

■ Thus, the only question is whether our decision in *Northern Helex II* is clearly erroneous and works a manifest injustice. The standard under this exception is a stringent one. As we stated in *Turtle Mountain Band*: "The purpose of the law–of–the–case principle is to provide finality to judicial decisions. A strong showing of clear error therefore is required before a court should reexamine its decision in the prior appeal." 222 Ct.Cl. at ——, 612 F.2d at 521. A mere suspicion of error, no matter how well supported, does not warrant reopening an already decided point. *See id.* Only if we were convinced to a certainty that our prior decision was incorrect would we be warranted in now reexamining *Northern Helex II.*

Such "strong showing of clear error" has not been made. Nothing the plaintiff asserts or shows convinces us that our 1975 decision was clearly incorrect.

An important reason for our refusal to reconsider our earlier decision in *Turtle Mountain Band*–the government's failure to make any new arguments on the issues involved–is equally pertinent here. With the exception of its arguments pertaining to excess values, which we discuss in section III.B. *infra,* all of the points the plaintiff now makes in support of its position were fully argued in the prior case. The adequacy of the plaintiff's prior presentation is demonstrated by the trial judge's acceptance at trial of those contentions, and the

fact that they convinced one member of the court, who dissented in *Northern Helex II.* Our lengthy and detailed opinion in that case addressed the plaintiff's material arguments and explained why we rejected them. The plaintiff has not presented any new arguments that were not fully canvassed and evaluated before, nor placed the issues in a different context that provides insights and illuminations not previously available.

In *Zdanok v. Glidden Co.,* 327 F.2d 944, 952 (2d Cir.), *cert. denied,* 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), the court refused to disturb an earlier decision in that litigation despite doubt created by a conflicting Sixth Circuit opinion, "particularly when superimposed on Chief Judge Lumbard's earlier dissent here and the great amount of critical discussion in the law reviews that our decision has engendered." The claims of error here are not as compelling as those in *Zdanok,* and do not create the doubt found in that case. We know nothing now that we did not know 5 years ago. We have no reason not to treat that earlier decision as the law of the case.

B. In *Northern Helex II* we stated that there should be subtracted from the total anticipated revenues under the contract not only the total stipulated anticipated manufacturing costs of $43,067,413, but also "any" "excess" value the helium plant had, reflecting (1) the amount by which the fair market value of the plant at the time of breach exceeded its depreciated original cost, and (2) the fact that the plant would continue to function as part of the plaintiff's integrated operation. 207 Ct.Cl. at 888–89, 524 F.2d at 721. We stated (*id.* 207 at 889, 524 F.2d at 721):

The sum of these two values represents the total excess value of the plaintiff in its helium plant that has not been expended nor exhausted by the performance of the contract with the Govern-

---

6. In his Memorandum of Pretrial Conference filed August 9, 1978, Trial Judge Spector stated that "[t]he trial will essentially be addressed to the issues of 'excess values,' and the KRH $2.87 million sale," which were factual issues left open by our 1975 opinion. The parties' stipulation, attached to the trial judge's memorandum, is entirely directed to those issues. The trial judge's additional factual findings are consistent with his first set of findings and seem to have been based on the record developed at the first trial.

ment, but is an asset or benefit conferred on the plaintiff by its performance of the Government contract and which it owned, possessed, and used at the time of the breach and still owns, possesses, and uses and will continue to own, possess, and use in the future in its integrated operations.

We further ruled that there should be deducted from the plaintiff's anticipated profits, calculated as there provided,

> any other savings to it by its non–performance of the contract because of the breach. The resulting figure, discounted to current value as of the date of entry of final judgment, should place the plaintiff in as good a position as it would have been in had the contract been fully performed.

*Id.* 207 at 890, 524 F.2d at 722.

Our ruling that the "excess" value of the plant should be subtracted from total anticipated revenue was intended to require the subtraction of only any excess value that resulted from the breach, as distinguished from excess plant value resulting from the contract itself. As we noted, the purpose of the damage award was to "place the plaintiff in as good a position as it would have been in had the contract been fully performed." The award was not intended to put the plaintiff in a better position. To the extent that the breach itself made the plant more valuable to the plaintiff, the damages were to be reduced by that increase in value, in accordance with the general rule that the injured party in a breach–of–contract action cannot recover for any benefits it realized from the breach.[7]

 We did not intend, however, that the amount of damages should be reduced to reflect increases in the value of the plant that either resulted from the performance of the contract or occurred after the breach but not because of it. In other words, the plaintiff is entitled to recover the full measure of the bargain it made with the government, including any particular values the plant constructed under the contract had

for it. Its entitlement is to be made whole for the damages it suffered from, but not to make a profit from, the breach.

The record does not show that the breach itself increased the value of the plant. The only evidence the government submitted on this issue shows that the contracts themselves made the plant more valuable to the plaintiff than the cost of the plant. This evidence, however, is insufficient to warrant reducing the damages by the amount of such excess. There is no adequate reason to believe that plaintiff could have realized on this "excess value" by selling or disposing of the plant at this fair market value without concomitantly harming its other activities. Accordingly, there is no excess value to be subtracted from the total anticipated revenue, which under steps (1) and (2) of the formula provided in *Northern Helex II* were to be used to reduce the award.

## IV.

 · The only remaining step is to determine the actual amount of damages, pursuant to the six–step formula in *Northern Helex II, supra,* 207 Ct.Cl. at 888–90, 524 F.2d at 721–22.

(1) and (2) As shown in the preceding section, both of these items are zero.

(3) The sum of (1) and (2) is therefore also zero.

(4) The sum of (3) (*i. e.,* zero) and the amount of total stipulated anticipated manufacturing costs (*i. e.,* $43,067,413) is $43,067,413.

(5) That amount when subtracted from the total anticipated revenues of $80,255,000, yields anticipated profit of $37,187,587.

(6) From anticipated profit, we deduct the proceeds of the sale of helium to Kansas Refined Helium ($2,872,547). We left open the possibility that the plaintiff might prove expenses themselves deductible from the sales proceeds; it did not do so, how-

---

7. This rule normally arises when the plaintiff could avoid losses by ceasing its performance (or does avoid losses by ceasing performance), and is applied in this context in this case on page 11, *infra. See* Restatement (Second) of Contracts § 361(d) (Tent. Draft No. 14, 1979).

ever. We also deduct the savings of $11,000 per year that the plaintiff would have received if it had not operated the helium plant. The contract was breached on December 24, 1970, and it would have terminated without breach on August 15, 1983. The period for which the plaintiff would have received this cost savings is therefore 12 years, 7 months, and 22 days. The total savings amount to $139,051. The government has not shown any other savings resulting from its breach and is not entitled to any further deductions.

Anticipated profit less the above two deductions yields a final amount of $34,175,989. This "resulting figure, discounted to current value as of the date of entry of final judgment should place the plaintiff in as good a position as it would have been in had the contract been fully performed." *Id.* 207 at 890, 524 F.2d at 722. All that remains before entry of final judgment, therefore, is to determine how much to discount that final amount.

We use a discount rate of 9 percent (derived from currently available conservative investment instruments) and an assumed date of final judgment of October 31, 1980. The applicable discount is $718,589. The plaintiff is therefore entitled to recover $33,457,400.

DAVIS, Judge, concurring:

If the issue were open, I tend to think that plaintiff might well not recover the full measure of anticipated profits for the period after the contract was terminated by Secretary Morton or Under Secretary Russell—if either of those terminations were held to be valid. But the issue of the validity of those terminations has not been litigated or conceded in this case, and the court's opinion of 1975, reported at 207 Ct.Cl. 862, 524 F.2d 707, seems to me to have rejected this possible defense and to have removed the terminations entirely from this case. Because I am bound under the doctrine of the law of the case by that decision of the court—which I do not regard as clearly erroneous or manifestly unjust—I now join in the Chief Judge's opinion and in the result.

NICHOLS, Judge, concurring:

Since I dissented in "*Northern Helex II*", 207 Ct.Cl. at 898, 524 F.2d at 726, and since my obstinacy in adhering to error is well known, it might have been expected that I would dissent this time around also. I do indeed still believe that I was correct in not wanting to deduct from the award the $43,067,413 figure stipulated as the anticipated cost of performance. But I join in the Chief Judge's opinion.

In *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 204 Ct.Cl. 831, 833, *cert. denied*, 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974), I was persuaded, after argument, that our previous decision on the same claim, reported 182 Ct.Cl. 543, 390 F.2d 686 (1968), though correct in its main point, was incorrect in one of lesser importance. I desired to withdraw my adherence to the prior opinion on that point and did so, but I said that because of the law of the case doctrine, my change of view should be without practical consequences in the litigation at hand. I said the doctrine did not compel us to adhere to "obvious wrong or manifest injustice committed in the course of passing on an interlocutory appeal." But I went on that "our error as to the school lands, though plain, is not sufficiently gross and flagrant to justify breaching the law of the case doctrine * * *." Evidently I was of the view that error *simpliciter* was entitled to law of the case protection but error characterizable by some kind of opprobrious epithet was not. I need not examine whether any real difference exists between the exception the Chief Judge would allow and mine, because by either test the prior decision, *Northern Helex II*, does not qualify for reconsideration. I was on the panel and joined in the opinion in *United States v. Turtle Mountain Band of Chippewa Indians*, 222 Ct.Cl. ——, 612 F.2d 517 (1979). My concurrence deals with issues other than law of the case. *Northern Helex II* is, in my view, in serious error, but not of the degree of obnoxiousness I would look for to breach the law of the case

constraints. There is no basis whatever for the charge that the majority in *Northern Helex II* misread *Northern Helex I* or made any of the fact mistakes the trial judge imputes to them. Right or wrong, they knew perfectly what they were doing. The matter was obviously debatable since it was debated among us, and I have no doubt the startling size of the award the trial judge would have made even then exerted its silent influence towards the choice the majority made among defensable alternatives. If there was "manifest injustice" it arguably was in the award that proper application of the rules of damage admeasurement seemingly would have required.

Judge Skelton, who wrote the majority opinion in *Northern Helex II*, Chief Judge Cowen, who wrote separately in concurrence, and the other judges, were of course well aware of my dissent when they voted as they did. They preferred to adhere to the old fiction that the opinion for the court is delivered in ignorance of what the dissent is going to say. The practice of making some specific response to dissents in prevailing opinions has become more general since then. It is in my view a salutary change, not only in assuaging the inaudibility syndrome of the dissenter, but also in avoiding misconceptions such as the trial judge indulged in here about the suppositions and assumptions of the majority opinion. For example, perhaps a footnote somewhere would have explained how it was the court found certain facts contrary to fact findings of the trial judge that defendant has not excepted to. The explanation I could have written myself: the court felt justified in disregarding certain facts it would not have denied were true in the real world, because it felt the contract relations of the parties postulated the constructive existence of different facts. The court felt the contractor had acquired by its contract no right to require defendant, in deciding on a breach, to consider that plaintiff would go on producing helium for reasons other than its government contract and therefore would not save the stipulated $43,067,413. The decision really went off on the Holmesian theory that a party to a contract has a legal right to breach it, unless the special conditions warranting specific performance exist, as here they did not. Thus the task of the court in assessing damages for a breach is not really to ascertain the full consequences of the breach as they are in the real world, and as it would in a tort case. This theory is not absurd and frequently influences our decisions. Judge Skelton cited some of them.

I do not see how our judicial system could continue to function if the proceedings of our trial judge here should become common. The comments of the Chief Judge I deem restrained in the circumstances. I certainly hope my dissent did not contribute to subsequent events; that nothing I ever write or say, dissenting, causes any future case to take the unfortunate course this one has followed. If I thought it had or would, I would be constrained to chill the freedom of comment I have hitherto indulged in when I have been unable to go along with the majority, a freedom my colleagues have been patient with and have enjoyed in their turn. None of us are obliged to praise the decisions that bind us, but we are obliged to follow them or else get off the bench.

This is one case where, in my speculation, the law as pronounced by the court might have been different if all the monetary figures had been divided by ten. A gut feeling that an award is too large or too small is not to be disregarded just because it is difficult to say why. It appears to me now that the majority's instinct might have been better implemented by a holding that, given a contract that had almost 13 years left to run at the time of breach, it was not reasonable to measure damages wholly by anticipated revenues whether offset or not offset by anticipated costs. This assumes either way a certainty in the prediction of future events that we do not rely on in managing our own affairs. Those contracting with the government have uncertainties about their prospects additional to those that may cause anxiety to holders of the contracts of private firms. The government may become involved in wars or civil disorders. It may as a result pass laws

allowing modification of its deals that it comes to consider ill advised. It may revoke its consent to suit and repudiate its debts. The contingencies for which defendant reserved the right to terminate might occur. For all these reasons, and wholly apart from the desire of the Nixon administration to get out of the contracts and stop stockpiling helium, the fair market value of that or any other government contract having nearly 13 years to run would not normally equal the capitalized value of all expected contractor revenues, net or gross. The government could have passed a law for the expropriation or taking by eminent domain of Northern Helex's contract rights, and if it had done so, the just compensation would not necessarily have equalled the anticipated revenues, net or gross, capitalized. *Cf. Lord Manufacturing Co. v. United States*, 114 Ct.Cl. 199 (1949), *cert. denied*, 339 U.S. 956, 70 S.Ct. 978, 94 L.Ed. 1368, *rehearing denied*, 340 U.S. 846, 71 S.Ct. 13, 95 L.Ed. 620 (1950). Thus the theory a contracting party has a legal right to breach his contract has special application to the government. It appears to me, therefore, that an adjustment to the anticipated contract revenues in the nature of a jury verdict would have been appropriate, and would have had a support in the facts and the law that is sadly lacking in the arbitrary offset of costs of performance that were not saved but still in fact incurred.

KUNZIG, Judge, concurring:

I concur in the Chief Judge's opinion, including the portion which makes clear that, in ruling the "excess" value of the plant should be subtracted from total anticipated revenue, we merely intended to require the subtraction of any excess value that resulted from the breach, as distinguished from excess plant value resulting from the contract itself.

## CONCLUSION OF LAW

Plaintiff is entitled to recover, and judgment is entered for the plaintiff for $33,457,400.