The GLOBE SAVINGS BANK, F.S.B., and Phoenix Capital Group, Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–1550C.

United States Court of Federal Claims.

Dec. 6, 2006.

Melvin C. Garbow, Arnold & Porter LLP, Washington, D.C., for plaintiffs. With him on the briefs were Howard N. Cayne, Kent A. Yalowitz, Michael A. Johnson, and Alexea R. Juliano, Arnold & Porter LLP, Washington, D.C.

Scott D. Austin, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, and of counsel were Elizabeth A. Holt and Brian A. Mizoguchi, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

### OPINION AND ORDER

LETTOW, Judge.

### INTRODUCTION

This *Winstar*-related case,[1] comes before the court a second time, and for a limited purpose. Previously, after a nineteen-day trial, the court awarded plaintiff Globe Savings Bank, F.S.B. ("Globe") lost profits and incidental damages totaling $33,963,706. *Globe Sav. Bank, F.S.B. v. United States,* No. 91–1550C (Fed.Cl. June 17, 2005) (Order for Entry of Final Judgment); *Globe Sav. Bank, F.S.B. v. United States,* 65 Fed.Cl. 330, 363–64 (2005). On appeal, the court of appeals "affirm[ed] the trial court's damages award in its entirety, with one exception." *Globe Sav. Bank, F.S.B. v. United States,* 189 Fed.Appx. 964 (Fed.Cir.2006). The exception related to one part of one component of the damages award. The award was comprised of three components: (1) lost profits from January 1, 1990 to August 31, 1999, (2) lost profits post-August 1999, and (3) incidental damages. The exception concerned whether "the post–1999 lost profits award of $13,061,260, *i.e.,* the residual value of Globe's branches in 1999, should be reduced by the value Globe received from the sale of its branches to MidFirst [Bank, S.S.B., Oklahoma City ("MidFirst"), a competing thrift,] in 1990 to avoid giving Globe the value for thrifts that it has already recouped." *Id.* The court of appeals affirmed the award of profits for 1990–1999 and incidental damages, but vacated the post–1999 lost profits award and remanded to provide for consideration of the exception. By this decision, the remanded question is resolved, and the previously awarded judgment for damages is reduced

---

1. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

by $1,158,000, to arrive at a final judgment in the amount of $32,805,706.

The parties have raised two additional issues that also are addressed by this decision. The government renews a contention that it made unsuccessfully to this court and then to the court of appeals that the award of damages should be reduced by $7,700,000, to reflect the amount of dividends paid and capital returned by Globe to its parent holding company after Globe wound up banking operations. In contrast, Globe seeks immediate and separate entry of a final judgment in the amount of $20,902,446, to reflect the portions of the damages judgment affirmed by the court of appeals. Both of these requests are denied for the reasons set out below.

## A. *The Remanded Issue*

■ Globe was a thrift savings bank that operated in Oklahoma in the late 1980s and 1990s. The enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") on August 9, 1989, Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S.Code, including 12 U.S.C. § 1464), removed the regulatory underpinnings for Globe's capital structure and caused it to embark upon and complete a voluntary liquidation of its banking operations.

Globe's voluntary liquidation was successful in the sense that Globe sold and disposed of all of its assets and liabilities and wound up its operations while avoiding an imminently threatened seizure by the Federal Deposit Insurance Corporation ("FDIC"). *See Globe,* 65 Fed.Cl. at 341–45. Globe's task in this regard was complex and difficult because it had built a sizeable portfolio of mortgage-backed securities coupled with duration-matched borrowings, employing a risk-controlled arbitrage program expressly approved and closely monitored by the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corporation ("FSLIC"). *Id.* at 334–35, 338–45. Globe's portfolio of mortgage-backed securities peaked at $735 million in June 1989, before the advent of FIRREA, *id.* at 356, and its duration-matched liabilities largely consisted of Federal Home Loan Bank advances, re-purchase agreements with Wall Street investment houses, and deposits. *Id.* at 338. Yet Globe unwound the whole portfolio quickly and adeptly, earning the praise of the bank regulators while avoiding seizure. In an examination of Globe in 1991, the FDIC opined that Globe had "sold off assets and deposit liabilities in impressive fashion to meet regulatory capital requirements." PX 454 at WOQ264 1376 (Letters from K. Walker, FDIC, to R. Karr, Office of Thrift Supervision ("OTS"), dated June 17, 1991, and to Globe's Board of Directors dated July 1, 1991, attaching FDIC Report of Examination (Apr. 29, 1991)).

The remanded issue focuses on Globe's sale of deposit liabilities. Globe sold six of its seven branches to MidFirst, realizing a very small core-deposit premium of 0.7% on the sale. Tr. 754:13 to 763:21; PX 408 (Letter from J. Laisle, president and chief executive officer of MidFirst, to M. Boswell–Carney, OTS (Oct. 16, 1990)). That sale closed in December 1990. *Globe,* 65 Fed.Cl. at 345. Globe kept the Harrah branch as a base from which it might complete its liquidation, and in due course Globe paid off all depositors of that branch and relinquished its thrift charter. *Id.*

In determining post–1999 lost profits and the part of incidental damages that consisted of deposit disposition costs, the court in *Globe* took Globe's branch network and its disposition of that network into account. Post–1999 lost profits were measured as the value Globe's branch network would have had as of 1999, based on the premise that Globe's business plan called for operation as a traditional thrift after the Oklahoma economy had recovered from the trough it entered in the mid–1980s and early 1990s and Globe had achieved a satisfactory tangible-capital position. *Globe,* 65 Fed.Cl. at 357–58. Deposit disposition costs were determined based on the difference between the premium Globe paid FSLIC to acquire the branches and the premium Globe received when it sold six branches to MidFirst. *Id.* at 362. The pay-off of deposits at the Harrah branch was considered as equivalent to a disposition for a zero premium. *Id.* To avoid double-counting, the lost profits were reduced by the

amount of the incidental damages. *Id.* at 364. Thus, in partial answer to the court of appeals' remanded question, Globe's branch sales to MidFirst were in fact taken into account in determining the post–1999 lost profits.

However, although the branch sales to MidFirst were specifically considered in connection with the post–1999 lost profits, that consideration was imperfectly accomplished. To complete the task, the court should also have reduced the post–1999 lost profits by the amount Globe salvaged from the branch sale to MidFirst. That amount was $1,158,000, reflecting a premium of only 0.7% on the $165.4 million of deposits sold. *Globe,* 65 Fed.Cl. at 345, 362. Globe claims that the court has already provided an offset for the MidFirst deposit premium by reducing its lost-profits damages by the amount of the incidental damages awarded. Plaintiffs' Reply in Support of Motion for Final Judgment and Response to Government's Cross–Motion for an Offset ("Pls.' Reply") at 16–18. As explained above, however, the incidental-damage reduction in the post–1999 lost profits mathematically took account only of the difference in the premiums Globe originally paid for the branches and that which it received upon disposition, not also the value received at disposition.

The government seeks a reduction greater than the value received by Globe, pointing out that Globe "recorded a $2,830,717 gain on the sale of its branches to MidFirst." Defendant's Opposition to Plaintiffs' Motion for Final Judgment and Cross–Motion for an Offset ("Def.'s Opp. and Cross–Mot.") at 12 (citing PX 475 at 0913, 0918 ("On December 31, 1990, the Bank disposed of the deposits, certain loans, and office properties and equipment relating to all of its branches except Harrah, Oklahoma. . . . The bank realized a gain on this transaction of approximately $2,830,000, exclusive of goodwill and core deposit premium charge-off.")). However, such a greater reduction is not warranted. The gain Globe booked on the branch sale reflects the means Globe chose to "pay" for the transfer of the deposit liabilities associated with the branches. To sell the branches, Globe had to pay MidFirst for the amount of the deposits less the deposit premium. To make that payment, Globe transferred assets to MidFirst that had the requisite value. The gain Globe booked stemmed from the fact that the transferred loans, properties, and equipment had a greater value in the transaction than their carrying value on Globe's books. This result is not surprising given the fact that interest rates had declined somewhat from the late 1980s to the end of 1990. Accordingly, the gain Globe realized for tax purposes does not reflect the actual value Globe received on the disposition. Rather, the premium Globe actually received on the sale of the branches was $1,158,000, wholly apart from the tax consequences of the transaction.

In short, the remanded question is resolved by reducing Globe's post–1999 damages by $1,158,000, the amount of the deposit premium realized upon the sale of branches to MidFirst. The government's claim to a greater offset is unavailing.

### B. *The Government's Renewed Claim for a Further Offset*

■ In the court of appeals, as in this court, the government previously urged that the lost profits awarded to Globe should be reduced to $7.7 million, the net amount Globe realized upon liquidation of all of its assets, which amount Globe transferred to its parent holding company after Globe ceased banking operations. *See* Petition for Panel Rehearing of Defendant–Appellant, the United States, *Globe Sav. Bank, F.S.B. v. United States,* 189 Fed.Appx. 964 (Fed.Cir.2006) (No. 06–5001) (filed Sept. 5, 2006). The government argued "that the market price of financial assets and liabilities is equal to the present value of the expected future cash flows from those assets and liabilities." *Id.* at 4. From this premise, the government contended that "the $7.7 million that Globe received upon its post-breach dissolution represented the then net present value of the future profits (cash flows) expected to be generated from Globe's portfolio of assets, liabilities (including its deposits), and hedging instruments from the date of liquidation into the indefinite future." *Id.* On this ground, the government petitioned the court of appeals to remand both portions of the lost-profits award, *i.e.,* that

from January 1, 1990 to August 31, 1999, and that from post–1999, rather than just the post–1999 award. *Id.* at 4–5. The court of appeals denied rehearing. *See* 189 Fed. Appx. 964. Now, the government renews this claim, arguing that the limited remand ordered by the court of appeals is broad enough to encompass an expanded offset of $7.7 million. Def.'s Opp. and Cross–Mot. at 5–9.

Whatever vesture the government applies to this claim, it has no merit for three separate and independent reasons.

First, the mandate rule and the law of the case doctrine preclude reconsideration by this court of a claim previously rejected and affirmed on appeal. " '[A] lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid to rest.' " *Northern Helex Co. v. United States,* 225 Ct.Cl. 194, 634 F.2d 557, 560 (1980) (quoting *Federal Commc'n Comm'n v. Pottsville Broad. Co.,* 309 U.S. 134, 140, 60 S.Ct. 437, 84 L.Ed. 656 (1940)). " 'An inferior court has no power or authority to deviate from the mandate issued by an appellate court.' " *Northern Helex,* 634 F.2d at 560 (quoting *Briggs v. Pennsylvania R.R.,* 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948)). "After an appellate court has decided a case and remanded to a lower court, the latter court 'is bound by the decree as the law of the case; and must carry it into execution.... That court cannot vary it, or examine it for any other purpose than execution; .... or review it, even for apparent error, upon any matter decided on appeal.' " *Northern Helex,* 634 F.2d at 560 (quoting *In re Sanford Fork & Tool Co.,* 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895)). *See also In re Roberts,* 846 F.2d 1360, 1363 (Fed.Cir.1988) ("Unlike the authority to reconsider its *own* rulings, a district court is without choice in obeying the mandate of the appellate court."); *Exxon Corp. v. United States,* 931 F.2d 874, 877 n. 7 (Fed.Cir.1991) (mandate constitutes law of the case on issues that were either explicitly or implicitly decided by the appellate tribunal). In short, a trial court acting on a remand order, may not reexamine any issues that were addressed either explicitly or implicitly by the appellate court. "[N]o litigant deserves an opportunity to go over the same ground twice." *Gindes v. United States,* 740 F.2d 947, 949 (Fed.Cir. 1984).

Second, the government's argument proceeds from the incorrect premise that Globe sold and disposed of its assets and liabilities at fair market prices. Globe instead liquidated its operations under distress-sale conditions, specifically to avoid seizure by the FDIC. It received worse than ordinary liquidation value for its assets. For example, it initially proposed to OTS that it sell branches to Equity Bank for Savings, F.A., but that proposed sale was rejected by OTS. *Globe,* 65 Fed.Cl. at 345. When that sale was precluded, Globe had to sell branches to MidFirst at a minimal deposit premium of 0.7%, a very low premium even judged by the constrained circumstances existing at that time, *see* Tr. 4105:1 to 4113:23 (Test. of Bankhead) (sale of approximately 40 branches from 1989 to 1992, some of which were by the Resolution Trust Corporation), or later in the 1990s. *See also* PX 584–30; *Globe,* 65 Fed.Cl. at 359–60 (weighted average premium of 6.62% for sales in 1998 and 1999). Moreover, a portion of the mortgage-backed securities held by Globe, such as the tax-advantaged residuals, was difficult to sell because the "thin" market for those securities was principally geared to entities that carried forward net operating losses. *Globe,* 65 Fed.Cl. at 337–38.

Third, even fair at-market sales by Globe of its assets would not reflect the long-term profits Globe expected to realize from its operations. A significant proportion of Globe's portfolio of mortgage-backed securities had particular value to Globe but would not have equivalent value in the hands of many others. The tax-advantaged residuals were one such security. In addition, pre-FIRREA Globe had the advantage of operating with a very low-cost capital structure, consisting largely of supervisory goodwill that counted as regulatory capital. *See Globe,* 65 Fed.Cl. at 334–40. Finally, the lost profits Globe proved at trial to a reasonable certainty were determined on a distinctly different basis than the residuum reflected

by the $7.7 million payment by Globe to its holding company.[2]

C. *Globe's Plea for a Separate and Immediately Effective Judgment on the Affirmed Portions of the Previously Entered Final Judgment*

■ Fearing that the government would again appeal from any final judgment the court might issue after the limited remand, Globe urges the court to enter "a prompt partial final judgment of $20,902,446," the damages awarded in the two components of the judgment affirmed by the court of appeals. *See* Plaintiffs' Motion for Final Judgment ("Pls.' Mot.") at 6–10; Pls.' Reply at 20–25. In support of this plea, Globe relies chiefly on the decisions in *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560 (Fed.Cir. 1987), and *Home Sav. of Am., F.S.B. v. United States*, 69 Fed.Cl. 187 (2005). The government resists any entry of partial judgment, noting that it still has the right to file a petition for writ of certiorari for review by the Supreme Court of the Federal Circuit's decision, *see* Def.'s Opp. and Cross–Mot. at 15, and that the rationale of the *King* decision was undercut by *Jalapeno Prop. Mgmt., L.L.C. v. Dukas*, 265 F.3d 506, 512–13 (6th Cir.2001) (disagreeing with *dictum* in *King* that Fed.R.Civ.P. 54(b) does not apply on remand to a trial court).[3]

Payments of judgments entered by this court against the United States may only be made with respect to final judgments, partial or otherwise. *See* 28 U.S.C. § 2517(a)-(b) (authorizing payment of a "final judgment" out of the Judgment Fund, including a "partial judgment"); *see also* 31 U.S.C. § 1304(a) (requiring "final judgment" for payment from the Judgment Fund). In this instance, a partial judgment is not appropriate because Globe has one unitary lost-profits claim, not two, and splitting that claim in halves would create difficulties in applying *res judicata* principles. This is so wholly apart from the question whether or not Rule 54(b) of the Rules of the Court of Federal Claims ("RCFC") applies to a request made to this court to direct a partial judgment on a portion of an original judgment affirmed on appeal. *See National Australia Bank v. United States*, 74 Fed.Cl. 435, at 438–39, 2006 WL 3347882, at *4 (Nov. 17, 2006). Claim splitting is generally barred, *see Restatement (Second) of Judgments* § 24 at 197 (1982), even if different "remedies or forms of relief" are sought, see id. § 25(2) at 209, excepting only special circumstances, as, for example, where the court has reserved the right to maintain a second action or where a continuing partial breach is involved and a plaintiff is given leave "to sue from time to time for the damages incurred to the date of suit." *Id.* § 26(1)(b), (e) at 233–34. None of the exceptions to claim splitting apply here, and the judgment should remain unitary to forestall confusion over what might be embraced within and by it.[4]

Globe is understandably concerned that this action has been pending for a long time and there is no provision for interest on a final judgment, *see* 28 U.S.C. §§ 1961(c)(3), 2516(a), even if the judgment might be affirmed by the Federal Circuit. *See Marathon Oil Co. v. United States*, 374 F.3d 1123, 1126–40 (Fed.Cir.2004). The only exception

---

2. The government additionally avers that it is entitled to a "secondary offset" measured by interest on the $7.7 million, to compensate for Globe's retention of that amount. Def.'s Opp. and Cross–Mot. at 6–9; Def.'s Reply at 14–16. That contention is unavailing because the government has no valid claim to a "primary offset" of $7.7 million. Moreover, in this case, Globe retained nothing of value that belonged to the government. Interest under any theory is simply not at issue.

3. In *King*, a trial court had awarded a patentee two categories of damages for infringement of a patent. On appeal, the Federal Circuit had affirmed an award of lost profits for "machine damages" but reversed and remanded an award

of damages for the sale of "spare parts." On remand, the trial court entered partial judgment for the affirmed damages plus interest, and the Federal Circuit on further appeal upheld that partial judgment as consistent with its mandate. *King*, 814 F.2d at 1563.

4. Subsection (b) of 28 U.S.C. § 2517 authorizes payment from the Judgment Fund for a "partial judgment" of this court, but in that event, payment of the judgment shall operate as a "full discharge" of "only the matters described therein." 28 U.S.C. § 2517(b). This statutory command in effect sets out a rule of *res judicata*, and thus calls for consideration of *res judicata* principles in deciding whether a partial judgment should be entered in any given case.

to the no-interest rule is for a judgment "against the United States affirmed by the Supreme Court after review on petition of the United States." 28 U.S.C. § 2516(b). *See also* 31 U.S.C. § 1304(b)(1)(B); *Marathon*, 374 F.3d at 1130. This result might not be just or equitable, but it is required by law. If the government chooses to appeal the judgment entered upon the instant decision, Globe will simply have to await the outcome of the appeal. No part of the judgment may yet be collected under 31 U.S.C. § 1304, even that part that the Federal Circuit has already affirmed.[5]

In short, the court rejects Globe's plea for a separate and immediately effective judgment as to the portions of the prior judgment affirmed by the court of appeals.

## CONCLUSION

For the reasons given, the court acts on the remand from the court of appeals, to reduce the amount of the judgment previously entered by $1,158,000, the value Globe received upon disposition of branches to Mid-First in December 1990. The final judgment amount thus is $32,805,706. The clerk shall enter a final judgment in favor of Globe for that amount. Globe's holding company, Phoenix Capital Group, Inc., is not entitled to a judgment in its favor.

As before, costs shall also be awarded to Globe pursuant to 28 U.S.C. § 2412(a) and RCFC 54(d).

IT IS SO ORDERED.

---

5. This would have been so even if the court had concluded that a partial judgment could have been entered as to the part of the judgment that was affirmed, because the government arguably could also have appealed entry of that partial judgment. *See King*, 814 F.2d at 1562–63.